Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3    ------------------------------------------X
4    TYNISHA WILLIAMS, both
     individually and on behalf
5    of a class of others
     similarly situated,
6
7                 Plaintiff,
8
         vs.                Case No.  09-CV-2991
9
10   THE CITY OF CLEVELAND,
11
                  Defendant.
12   ------------------------------------------X
13
14                Deposition of
                 JOSEPH STOTTNER
15
16
                 September 10, 2015
17                  10:43 a.m.
18
19                  Taken at:
                 City of Cleveland
20               Department of Law
            601 Lakeside Avenue, Room 106
21               Cleveland, Ohio 44114
22
23      Tracy Morse, RPR and Notary Public
24
25

```
                                                  Page 2
 1   APPEARANCES:

 2

 3        On behalf of the Plaintiff:
                 Law Offices of Elmer Robert
 4               Keach, III, by
                 ELMER ROBERT KEACH, III, ESQ.
 5               1 Pine West Plaza, Suite 109
                 Albany, New York  12205
 6               518-434-1718
                 bobkeach@keachlawfirm.com

 7

 8

          On behalf of the Defendant:
 9               City of Cleveland Law Dept., by
                 ALEJANDRO L. CORTES, ESQ.
10               Law Department
                 601 Lakeside Avenue, Room 106
11               Cleveland, Ohio  44114
                 216-664-3559
12               jdinehart@city.cleveland.oh.us

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TRANSCRIPT INDEX

2

   APPEARANCES............................    2

3

   INDEX OF EXHIBITS......................    4

4

   EXAMINATION OF JOSEPH STOTTNER

5   By MR. KEACH...........................    5

6   REPORTER'S CERTIFICATE................  115

7   ACKNOWLEDGMENT OF DEPONENT............  117

8

9   (EXHIBITS WERE SUPPLIED TO REPORTER)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXHIBITS

2     NUMBER             DESCRIPTION            MARKED

3     Exhibit 20A Photograph................... 29

      Exhibit 21  Photograph................... 91

4     Exhibit 22  Handwritten Notes of Elmer

                  Robert Keach................. 95

5     Exhibit 23  Handwritten Notes of Elmer

                  Robert Keach................. 95

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          JOSEPH STOTTNER, of lawful age, called

2     for examination, as provided by the Federal

3     Rules of Civil Procedure, being by me first

4     duly sworn, as hereinafter certified, deposed

5     and said as follows:

6               EXAMINATION OF JOSEPH STOTTNER

7     BY MR. KEACH:

8          Q.    Lieutenant Stottner, my name is

9     Attorney Bob Keach.  I'm a civil rights lawyer

10    from Albany.  I'm here to take your testimony

11    today in a civil rights lawsuit that's been

12    filed by Tynisha Williams against the City of

13    Cleveland, and also Shawn Bealer who is a

14    plaintiff.  What we are participating in today

15    is called a deposition where I get to ask you

16    questions and you have to provide me with a

17    verbal response.  Our court reporter cannot

18    take down a shake or nod of the head or some

19    sort of hand gesture.  Have you ever been

20    deposed before today, sir?

21         A.    Yes.

22         Q.    On how many occasions?

23         A.    Once a few years ago.

24         Q.    What was that about?  Why were you

25    deposed?

Page 6

1          A.    If I remember correctly, it was in

2     connection with this.  It was --

3          Q.    Okay.  Because I don't remember

4     ever taking your testimony in this case.  I

5     know I didn't.  The only deponents I deposed

6     were Bounds and Lewis.  You remember

7     participating in a deposition such as today

8     where you were put under oath and asked

9     questions?

10         A.    Yes.

11         Q.    And you think it was involving this

12    case?

13         A.    I don't recall, really.  It was

14    several years ago.

15         Q.    Were you sued in the case you were

16    deposed in?

17         A.    No.

18         Q.    Do you remember what the subject

19    matter of your testimony was?

20         A.    No.  It was brief.

21         Q.    Okay.  Is that the only time you

22    were deposed?

23         A.    Yes.

24         Q.    When I'm questioning you today, you

25    need to make sure that you let me finish my

Page 7

1    questions.  I'm going to show you the same
2    courtesy when I ask you a question and wait for
3    your response.  That way you and I can avoid
4    talking over each other.  Talking over each
5    other in depositions is a bad thing.  It can
6    cloud the record.  It makes it difficult for
7    counsel to object and also just makes our lives
8    a lot harder.  If you need a break today for
9    any reason, all you have to do is ask me and
10   I'll be happy to accommodate you.  If you need
11   to use the bathroom, if you need to get a drink
12   of water, if you want to take a walk, whatever
13   it is, just tell me.  I'll accommodate you.
14   All I ask for in return, sir, is you not ask me
15   for a break when there's a question pending or
16   where I'm asking you about a document.  Does
17   that sound fair?
18        A.    Yes.
19        Q.    If there's some emergency situation
20   you have to deal with -- there's a riot out at
21   the workhouse or you have a pregnant wife or
22   sick kid -- let me know and I'll accommodate
23   you right away.  You won't have to wait to ask
24   for a break in that situation.  Finally, I'm
25   not a perfect examiner.  Sometimes I ask

1    questions witnesses don't understand.

2    Sometimes I use words they don't understand.

3    Sometimes there's a dialogue between counsel

4    that can preclude -- you know, we interfere

5    with the witness's ability to understand a

6    question.  If that happens, I need you to tell

7    me there's a question and I'll take the steps

8    necessary to make sure you can understand me.

9    On the flip side, sir, if you answer my

10   question, I'm going to assume you understood

11   me.  Does that sound fair?

12        A.    Yes.

13        Q.    You understand you're under oath

14   today?

15        A.    Yes.

16        Q.    And you understand being under oath

17   today in the presence of our court reporter is

18   the same thing as being under oath in the

19   presence of the federal court under whose power

20   you're being deposed?

21        A.    Yes.

22        Q.    Are you taking any medication today

23   that would preclude your ability to testify

24   truthfully about the facts and circumstances in

25   this action?

                                                    Page 9

1          A.     No.

2          Q.     Lieutenant Stottner, how long have

3     you been working for the City of Cleveland?

4          A.     Since 1994.

5          Q.     And has that been at the division

6     of correction?

7          A.     Not exclusively.

8          Q.     All right.  Where else have you

9     worked for the City of Cleveland, besides the

10    division of correction?

11         A.     Division of police and department

12    of law.

13         Q.     Did you work as a police officer?

14         A.     No.

15         Q.     Well, how did you work for the

16    division of police?

17         A.     Institutional guard.

18         Q.     Was that at the Justice Center?

19         A.     Police headquarters.

20         Q.     Oh, institutional guard at police

21    headquarters?

22         A.     Yes.

23         Q.     Okay.  Was that a uniform position?

24         A.     Yes.

25         Q.     You weren't considered a police

```
                                                   Page 10
 1   officer, however?
 2          A.     No.
 3          Q.     You also worked for the department
 4   of law?
 5          A.     Yes.
 6          Q.     You mean, where we are now?
 7          A.     Yes.  City of Cleveland.
 8          Q.     How did you work for the department
 9   of law?
10          A.     Assistant prosecutor.
11          Q.     You're an attorney?
12          A.     Yes.
13          Q.     I didn't think the City of
14   Cleveland had prosecutors.  Were you a
15   municipal court prosecutor?
16          A.     Yes.
17          Q.     And when did you go to law school?
18          A.     1998 to 2002.
19          Q.     Where did you go to law school?
20          A.     Cleveland Marshall College of Law,
21   Cleveland State University.
22          Q.     All right.  And you passed the bar?
23          A.     Yes.
24          Q.     What year?
25          A.     2003.
```

1          Q.     So did you prosecute municipal

2    court violations?  Is that accurate?

3          A.     Yes.

4          Q.     Did you prosecute misdemeanors as

5    well or just municipal level offenses?

6          A.     I'm not sure exactly the question.

7          Q.     All right.  My understanding is in

8    Ohio law -- and your knowledge of it is

9    probably more thorough than mine is.  My

10   understanding is there are county municipal

11   violations, which could also be characterized

12   as minor misdemeanors.  Then there are

13   misdemeanors.  Then there are felonies.  Is

14   that your understanding of the scope of things

15   you can do wrong in Ohio to get charged with a

16   crime?

17         A.     Yes.

18         Q.     Okay.  So what type of offenses did

19   you prosecute working for the City of Cleveland

20   in the department of law?

21         A.     A majority domestic violence cases

22   but other misdemeanors and minor misdemeanors

23   as well as needed.

24         Q.     All right.  All those domestic

25   violence cases, were they all misdemeanors?

1          A.      Yes.

2          Q.      And felonies would be prosecuted by

3     the Cuyahoga County district attorney?

4          A.      Yes.

5          Q.      So did you go to night school or

6     did you go to school full-time?

7          A.      Full-time at night.

8          Q.      Full-time at night.  All right.  So

9     you were still working in your job with the

10    City of Cleveland at the same time you were

11    going to law school?

12         A.      Yes.

13         Q.      You said you started with the City

14    of Cleveland in -- was it 1994?  Did I get that

15    right?

16         A.      Yes.

17         Q.      And you started working for the

18    City of Cleveland how?

19         A.      Institutional guard.

20         Q.      And that was in the police

21    department.  Okay.  How long did you work as an

22    institutional guard at the police department?

23         A.      Until 2004 -- 2003, actually.

24         Q.      All right.  So you worked from 1994

25    to 2003 at the police department as an

```
                                            Page 13
 1    institutional guard.  What was the next job you

 2    had in the City of Cleveland?  Was that when

 3    you became an assistant prosecutor?

 4           A.    Yes.

 5           Q.    How long were you an assistant

 6    prosecutor?

 7           A.    From that time until 2010.  I mean,

 8    2007, 2007.

 9           Q.    So you did that job for four years?

10           A.    Three.

11           Q.    In 2007, where did you go?

12           A.    City of Cleveland, division of

13    correction.

14           Q.    What role did you fill in the City

15    of Cleveland, division of correction?

16           A.    My title was jail manager.

17           Q.    So you were the jail manager for

18    what period of time the division of correction?

19    From 2007 until when?

20           A.    From 2007 to 2010.

21           Q.    And then in 2010, what position did

22    you assume with the division of correction?

23           A.    Supervisor was the title.

24           Q.    Is that below the jail manager?

25           A.    I would say so, yes.
```

Page 14

1        Q.    So was that a demotion?

2        A.    Not technically, but as a working

3    title, yes.  Technically they're all

4    supervisors.  That's how it is.

5        Q.    I understand.  Why did you cease to

6    be the jail manager and get moved to the

7    position of supervisor?

8        A.    That was a decision made by the

9    safety director.  I couldn't tell you his

10   reasons.

11       Q.    Who is that?

12       A.    Marty Flask.

13       Q.    So no one ever gave you an

14   explanation as to why you were moved from your

15   position as jail manager to being a supervisor?

16       A.    No.

17       Q.    Who took over for you as being the

18   jail manager?

19       A.    David Carroll.

20       Q.    And he remained the jail manager

21   for some period of time.  Fair to say?

22       A.    Yes.

23       Q.    Did Lieutenant Flowers take over as

24   the jail manager at some point?

25       A.    Not from me, per se.  He's at the

Page 15

1  house of corrections. We have two jail
2  managers.
3      Q.   Okay. Now I understand. Were you
4  the jail manager down at the Justice Center?
5      A.   Yes.
6      Q.   Was there ever a point in time when
7  you were employed at the house of corrections
8  as a supervisor?
9      A.   Not as a supervisor, no. As a jail
10 manager briefly.
11     Q.   Okay. Here's why I took your
12 testimony -- well, there's a number of reasons
13 why, but there's an electronic mail message in
14 April of 2010 from Jacqueline Lewis to you
15 detailing that the facility was going to stop
16 delousing people --
17     A.   Um-hum.
18     Q.   -- did you see that email before
19 today?
20     A.   I don't recall it, but I know it
21 was sent.
22     Q.   Okay. I'm going to show you what's
23 previously been marked in this case as
24 Plaintiff's Exhibit 6. The email reads, "Have
25 ID person stop the delousing of prisoners today

```
                                          Page 16
1   ASAP.  Put out memo and tell day shift.  LT
2   JAL."  It's one page.
3              MR. KEACH:    Do you need to see
4   it, Alejandro?
5              MR. CORTES:   No.  I've seen it.
6        A.    I looked at the exhibit.
7        Q.    So in April of 2010, were you
8   working as the jail manager at the house of
9   corrections?
10       A.    Yes.
11       Q.    And do you remember the time period
12  that you served as the jail manager at the
13  house of corrections?
14       A.    Not clearly.  There were times when
15  maybe if someone was on a vacation, so it was a
16  little bit of an interchange.
17       Q.    Okay.  I understand.  The primary
18  period of time --
19       A.    Right.
20       Q.    I'm sorry.  The primary location
21  where you were a jail manager during your
22  tenure as jail manager was down at the Justice
23  Center?
24       A.    Yes.
25       Q.    And then you were the jail manager
```

```
                                            Page 17
 1   at the workhouse for a limited period of time.
 2        A.    Yes.
 3        Q.    And that period of time would have
 4   included April 14, 2010, when this email was
 5   sent to you by Jacqueline Lewis.
 6        A.    Best of my recollection.  No, no,
 7   no, I'm not saying that.  It's -- I mean, the
 8   dates are not very clear.  I never made a note
 9   of them.  I believe so, but --
10        Q.    Okay.  Can you give me an order of
11   magnitude about how long you were employed as
12   the jail manager exclusively at the house of
13   corrections?  I understand if you went out and
14   filled in for --
15        A.    Right.  Total time?
16        Q.    Yes.
17        A.    A rough estimate would be three,
18   four months.
19        Q.    All right.  What did you do after
20   you ceased being a jail manager at the house of
21   corrections?
22        A.    Well, I was acting commissioner
23   briefly.
24        Q.    Acting commissioner for?
25        A.    Division of correction.
```

```
                                            Page 18
  1          Q.    Division of correction.  And that
  2   was after you were the jail manager at the
  3   house of corrections?
  4          A.    It was after that point.
  5          Q.    Okay.  How long you were acting
  6   commissioner?
  7          A.    Approximately two or so months.
  8          Q.    How come your tenure as acting
  9   commissioner was so brief?
 10          A.    Well, they had Assistant Director
 11   Mary Bounds become the acting commissioner.
 12          Q.    What happened after you were acting
 13   commissioner for two months?
 14          A.    As far as?
 15          Q.    What was your next job?
 16          A.    I was downtown at the city jail.
 17          Q.    In what capacity?  Supervisor?
 18          A.    Supervisor.
 19          Q.    Have you stayed in that capacity
 20   downtown in the city jail since that time?
 21          A.    Yes.
 22          Q.    Have you worked out at the
 23   workhouse since that time?
 24          A.    No.
 25          Q.    And that's your job today, is you
```

1    are a supervisor at the city jail?

2         A.    Yes.

3         Q.    When you became the jail manager of

4    the house of corrections, what was your

5    understanding of the delousing procedures that

6    were employed at the workhouse?

7         A.    As far as -- my understanding

8    whether it occurred or --

9         Q.    All right.

10        A.    -- I want to be clear.

11        Q.    I understand.  You know, it's rare

12   that I get to depose a lawyer, so it makes

13   things even more difficult.  Let me ask you a

14   couple of questions --

15        A.    Sure.

16        Q.    -- let me do some background and

17   then we'll get into that.  Why did you leave

18   practicing law to go into corrections to be a

19   jail manager?

20        A.    Well, it was a move that was

21   recommended to me in more ways than one, so.

22        Q.    Who recommended it to you?

23        A.    Well, I wanted to remain with the

24   City of Cleveland so I went there.

25        Q.    Okay.

```
                                              Page 20
 1              MR. KEACH:    Off the record a

 2    second.

 3          (Discussion held off the record.)

 4    BY MR. KEACH:

 5          Q.    Okay.  Fair to say you haven't

 6    practiced law, since you left working in the

 7    department of law here in the City of

 8    Cleveland?

 9          A.    Correct.

10          Q.    What is your understanding of what

11    was happening with delousing when you were the

12    jail manager, before you got Mary Bounds' memo?

13              MR. CORTES:  Jackie Lewis's memo.

14          Q.    I'm sorry.  Jackie Lewis's memo.

15          A.    My understanding was that it was a

16    common practice for newly admitted offenders

17    who had been sent to the Cleveland House of

18    Corrections -- or workhouse is the name that

19    they use commonly for that -- that it was a

20    procedure that had been in place for many years

21    under the department of public health, which is

22    where the workhouse was under before this, and

23    that was instituted for health and safety

24    reasons, that everyone went through the

25    delousing procedure as part of arrival as part
```

1  of their intake.

2       Q.    Okay.  What is your understanding

3  of what the physical mechanism was by which the

4  City of Cleveland deloused people?

5       A.    They used a safe chemical spray and

6  it was sort of a head-to-toe bathing in the

7  spray.  They had a pumper.

8       Q.    Okay.  You ever see the pumper?

9       A.    I saw the pumper.

10      Q.    It was some sort of exterminator

11 can pressurized.  Fair to say?

12      A.    It is some sort of pressurized can,

13 like a pressurized can, a sprayer.

14      Q.    Did you ever observe that being

15 done to a detainee --

16      A.    No.

17      Q.    -- meaning the detainee being

18 deloused?

19      A.    No.

20      Q.    When you came into the facility and

21 learned that was the procedure -- is this what

22 you learned right when you first took over as

23 jail manager, that that's how they were doing

24 things, or how did you learn about it?

25      A.    Yes, it was part of the job, yes.

```
                                          Page 22

 1         Q.     Okay.  Where did you go to college?

 2         A.     College?

 3         Q.     Yes.

 4         A.     Undergrad?

 5         Q.     Yes, undergrad.

 6         A.     John Carroll University.

 7         Q.     Is John Carroll here in Cleveland?

 8         A.     A suburb of Cleveland.

 9         Q.     What degree did you receive?

10         A.     A bachelor of arts.

11         Q.     In what subject, field of study?

12         A.     History and political science and

13   classical studies.

14         Q.     Okay.  Do you have any other

15   degrees, besides your law degree and the degree

16   you received from John Carroll?

17         A.     Yes.

18         Q.     What degree do you have?

19         A.     A master's of arts.

20         Q.     In what field?

21         A.     International politics and

22   security.

23         Q.     Where did you receive that degree?

24         A.     University of Denver.

25         Q.     Did you go to Denver and study
```

```
                                              Page 23
 1    there or was that a group distance learning

 2    program?

 3          A.    I was at Denver.

 4          Q.    Someone with your level of

 5    education coming in and looking at that sort of

 6    procedure, did that strike you as kind of odd?

 7                MR. CORTES:  Objection.

 8          You can answer.

 9          A.    I wouldn't say so.

10          Q.    Well, let me ask you this before I

11    follow up on that:  Are you aware of that sort

12    of procedure being employed anywhere in the

13    United States besides Cleveland?

14          A.    I'm not aware on my own, no, no.

15          Q.    Were you a member of the American

16    Jail Association, American Corrections

17    Association, any sort of professional

18    organization that are involved in the

19    corrections field?

20          A.    No.

21          Q.    Did you ever attend jail manager

22    meetings at a place called The Ohio Department

23    of Rehabilitation?  It's their corrections

24    department.

25          A.    No.  We were never sent.
```

                                                    Page 24

1        Q.     So you're aware that they occurred.

2    You just never went?

3        A.     I was aware there were various

4    associations.

5        Q.     So it didn't strike you as odd --

6    well, let me step back.  Don't you think that's

7    degrading to people to --

8              MR. CORTES:  Objection.

9              MR. KEACH:    You've got to let me

10   finish my question.

11             MR. CORTES:  I thought you did.

12       Q.     Don't you think it's degrading to

13   people to spray down their bodies with a

14   pressurized spray of delousing solution,

15   including spraying it on their genitals?

16             MR. CORTES:  Objection.

17       You can answer.

18       A.     You're asking if I personally feel

19   that it's degrading?

20       Q.     Yeah.

21       A.     I would say, no.

22       Q.     Has anyone ever done that to you?

23       A.     No.

24       Q.     Why don't you feel that's

25   degrading?

1          A.    My personal reasons, from what I

2   understood of the procedure was that it was a

3   health issue.  It was brief, painless and

4   necessary to prevent an infestation in the

5   dormitories at the workhouse.  I know there

6   have been infestations in the past with lice

7   and similar creatures --

8          Q.    Okay.

9          A.    -- my understanding is it was also

10  done one person at a time and with some

11  privacy, so it wasn't a public spectacle, so

12  that wasn't --

13         Q.    Well, I had the opportunity

14  yesterday to go out and conduct an inspection.

15  How do you know the delousing was done in

16  private?

17         A.    I never observed the delousing, but

18  I understood that was the policy and procedure.

19  And I was never notified otherwise or aware of

20  in any way that it wasn't -- that it was in any

21  way a public procedure.

22         Q.    Did you ever go back into the

23  shower room in the ID unit and look at it?

24         A.    Yes.

25         Q.    So if a detainee is in the shower,

1  taking a shower and another detainee is being

2  deloused in that space, if that detainee in the

3  shower wants to look at what's being done to

4  the detainee being deloused, that can occur,

5  can't it?

6          A.    It could occur if multiple people

7  are back there.

8          Q.    Yeah.  Well, that's what happens,

9  right?  Multiple people have to go back there

10  and get deloused and get their clothes, right?

11          A.    There are many possibilities.  I'm

12  just speculating at this point.

13          Q.    Well, there are three shower

14  stalls --

15          A.    Um-hum.

16          Q.    -- and there was some sort of black

17  mat back there over top of the drain, right?

18          A.    I don't recall 2010 or 2009, when I

19  went back there specifically, but I understood

20  that we had -- I remember we had the shower

21  areas back there, yeah.

22          Q.    All right.  If I showed you some

23  pictures of the shower area, would that refresh

24  your recollection?

25          A.    Perhaps.  I recall going there.  I

Page 27

1   just, you know --

2         Q.    I understand.  So I took some

3   photos last night.  I haven't had a chance to

4   send them to my iPad unfortunately, but it's

5   easy enough to pull them up here.  And as we

6   mark them, we'll identify them and send them

7   over to our court reporter and Mr. Cortes.

8         I'm going to show you what we're going to

9   mark as Exhibit 20A, which is a photograph I

10  took yesterday at the Cleveland workhouse of

11  the showers.  I'm going to ask you to take a

12  look at it and see if that refreshes your

13  recollection as to what the shower area looks

14  like in the Cleveland workhouse.

15        A.    It seems similar.  I can't be a

16  hundred percent certain.  It was several years

17  ago.  It was a small shower.  I remember that.

18        Q.    I can represent to you that I was

19  there last night with Mr. Cortes and I took

20  that photograph in that shower.

21        A.    In the ID area, the intake area?

22        Q.    Yes.

23        A.    Okay.

24        Q.    So that is the shower.

25        A.    Okay.

                                              Page 28

1        Q.     Now, you would agree with me that
2   looking at the drain -- and these are the
3   stalls that are back behind these walls,
4   correct?  (Indicating.)
5        A.     Yes.
6        Q.     -- at the time this is done, you
7   can see there's a ring there.  There were
8   shower curtains that girls could pull, right?
9        A.     Yes.  I can see the ring.
10        Q.     So you and I agree that if someone
11   is in this middle shower on Exhibit 20A and a
12   girl is standing here getting deloused over the
13   drain, that if this girl chooses to do so, she
14   can look out and see another detainee getting
15   deloused.  Fair to say?
16              MR. CORTES:  Objection.
17        You can answer.
18        A.     If two people were positioned that
19   way, it could happen.
20        Q.     And what if the girl in the middle
21   stall was done taking a shower and she went to
22   leave the shower and didn't realize the other
23   girl was being deloused?  She would then see
24   the other girl being deloused as well, wouldn't
25   she?

```
                                               Page 29
 1              MR. CORTES:    Objection.
 2        You can answer.
 3        A.    If everything happened that way, as
 4   you're saying --
 5        Q.    Then the answer would be, yes?
 6        A.    Yeah, I mean, given those facts.
 7        Q.    Okay.  Just a minute here.
 8                     -  -  -  -  -
 9              (Thereupon, Deposition Exhibit 20A,
10              Photograph, was marked for purposes
11              of identification.)
12                     -  -  -  -  -
13        Q.    Now, getting back to what I asked
14   you before about the manner in which this
15   delousing was done.  You don't feel it's
16   humiliating to have a spray cannister spray
17   delousing solution onto the genitals of the
18   detainee when that delousing solution is
19   applied by a complete stranger?
20        A.    My personal feelings, not
21   necessarily, no.
22        Q.    Well, would you feel humiliated if
23   someone did that to you?
24              MR. CORTES:  Objection.
25        You can answer.
```

1      A.    It would depend on the

2   circumstances.

3      Q.    Why would it depend on the

4   circumstances?

5      A.    I understood that if I were in a

6   prison or part of the military, health issues

7   are extremely important in close circumstances.

8   I mean, close quarters.  If it were a random

9   person on the street, I would be upset of

10  course.

11     Q.    Well, let's clarify that.  Let's

12  assume you never met me before and I somehow

13  take you into custody and lined you up against

14  the wall and forced you to drop all your

15  clothes and I sprayed solution on your

16  genitals.  You're going to feel humiliated,

17  aren't you?

18          MR. CORTES:   Continuing objection

19  to this line of questioning.

20     Go ahead and answer.  I don't want to

21  keep interrupting.

22     A.    It's really just conjecture.  I

23  mean, it would depend on the circumstances.

24     Q.    The circumstances are just as I

25  described them.  I'm a police officer.  I

Page 31

1   arrest you for a minor misdemeanor.  I take you

2   down to the police department and take a look

3   at you and say, "You know what?  You look like

4   you're filthy.  I'm going to delouse you."  I

5   force you to drop all your clothes and I hose

6   you down with a pressurized spray cannister.

7        A.    Okay.  I mean, those are different

8   circumstances than what was at the workhouse.

9   Those are different circumstances and I might

10  feel more leery with that.

11       Q.    If that was done to you as I

12  described, you'd be humiliated, wouldn't you?

13       A.    It would depend.  I'm not going to

14  assume anything until it happens.

15       Q.    You can't agree with me that if I

16  just pulled you off the street as a complete

17  stranger and sprayed some sort of solution on

18  to your penis that you wouldn't find that

19  humiliating.  That's what your testimony is?

20            MR. CORTES:   He's already answered

21  the question.

22            MR. KEACH:    I understand.  And

23  I'm asking it again.

24       Q.    That's your testimony?

25            MR. CORTES:  Again, objection.

```
                                              Page 32
 1          You can answer.

 2          A.    It would really depend on the

 3   circumstances.  If I'm entering an institution

 4   and I'm going to be committed there for a

 5   while, there are procedures in place that I

 6   need to understand that.  If you did this in a

 7   police car on the side of the street, I would

 8   wonder what the necessity was, the urgency.  It

 9   depends.

10          Q.    So if it was a police car on the

11   side of the street and they did that to you,

12   you would be embarrassed.  Fair to say?

13          A.    I would -- well, I would be

14   wondering what was going on.  I would be -- no.

15   Possibly upsetting, yeah.

16          Q.    You can't answer my question "yes"

17   or "no," that you'd be embarrassed if some

18   police officer pulled you off the street and

19   did this to you for no reason, that's what

20   you're telling me?

21          A.    Well, if they had no reason, then

22   of course it would be upsetting.

23          Q.    Yeah.  Because you don't want

24   someone spraying stuff on your penis, right?

25          A.    If it's not necessary.
```

1      Q.    Okay.  Did you read the sixth

2   circuit's opinion in this case?

3      A.    No.

4      Q.    Are you aware of it?

5      A.    Yes, but --

6      Q.    Okay.  How are you aware of the

7   sixth circuit's opinion in this case?

8      A.    I heard mention of it.

9      Q.    By someone other than a lawyer?

10      A.    Yes.

11      Q.    From who?

12      A.    I don't recall.  I know this case

13   has been pending for a while and mention has

14   been made.

15      Q.    All right.  Well, let me ask you

16   this question:  Wouldn't you agree with me that

17   if someone was being deloused and somebody else

18   who's also a stranger could see that, that that

19   would be embarrassing to somebody?

20           MR. CORTES:  Objection.

21      You can answer, if you can.

22      A.    Well, to be quite frank, that

23   really -- just given my experiences, that

24   really would depend on the person in question

25   as to what their feelings may or may not be.  I

1   don't want to presume anybody's --

2         Q.    Okay.  Well, let's look at --

3         A.    -- feelings.

4         Q.    -- your feelings for a minute.

5         A.    Okay.

6         Q.    My understanding is that this

7   delousing solution was sprayed on to people

8   using this pressurized spray cannister and then

9   they were required, in the presence of the

10  corrections officer, to work that material in

11  to their pubic hair and into the hair on their

12  head.  Is that accurate?

13        A.    My understanding was that they were

14  sprayed and they were required to wash it off,

15  hence being in the shower.

16        Q.    Well, I can tell you from

17  yesterday's testimony that there is testimony

18  in this case that they were required to sit

19  there and work it in and in fact the

20  instructions on the bottle of Liceall also

21  required the solution to be kneaded into the

22  pubic hair to have maximize effectiveness.  So

23  following through on that analysis, if you're

24  standing in that shower -- let's assume you're

25  arrested.  You know, I've used this

Page 35

1  hypothetical repeatedly.

2       You're at the Hard Rock Cafe and you're

3  from out of town.  You're watching the NBA

4  Finals.  You know, the Cavs lose, I think it

5  was game 6 of the NBA Finals.  You're really

6  upset because you want the Cavs to win, so you

7  break a couple of beer glasses.  You break a

8  couple of beer bottles.  You make a commotion.

9  You're jumping up and down and screaming.  You

10 commit a misdemeanor disorderly conduct, not a

11 minor misdemeanor but a misdemeanor disorderly

12 conduct.  You go down to the Justice Center.

13 That's how it would work, right?  You get

14 arrested and go to the Justice Center normally.

15       A.    Normally.

16       Q.    So I go down to the Justice Center

17 and I'm held for a while and then I see a

18 judge.  The judge is like, You know, you're

19 from out of town.  I don't know you're going to

20 show up again.  I'm putting $1,000 bail on you.

21 You don't have $1,000, because you're from out

22 of town.  So you end up having -- at that point

23 in time, if you can't make your bail, you're

24 going to go to the Justice Center, right?

25       A.    To the house of correction.

```
                                                        Page 36
 1          Q.     Right.  My apologies.  To the
 2   workhouse.  So you come out to the workhouse
 3   and you're standing there.  You're about to be
 4   deloused.  There's someone else in the shower.
 5   And while other people are in the shower,
 6   you're being sprayed in this manner and asked
 7   to work the solution into your pubic hair when
 8   there may be a complete stranger, besides the
 9   corrections officer who's been standing there,
10   watching you do that or may catch a glimpse of
11   you just by happenstance.  That would be pretty
12   humiliating, wouldn't it?
13                MR. CORTES:   Objection.
14          Q.     You're sitting there working
15   delousing solution into your pubic hair while
16   somebody else could be watching from the
17   shower.
18                MR. CORTES:   Objection.
19          You can answer, if you can.
20          A.     Well, to be frank, if I didn't want
21   to work it in, I wouldn't.  I would just wash
22   it off.
23          Q.     What if you were directed by a
24   corrections officer to work it in?
25          A.     You're not going to force me.  If I
```

Page 37

1  don't want to work it in, I won't work it in.

2  I'll just rinse it off.

3      Q.    Well, are you aware of there being

4  any occasion where someone was directed to work

5  this stuff in to their pubic hair and they

6  failed to do so?

7      A.    No.

8      Q.    Okay.  So I understand if you

9  didn't want to work it in, you wouldn't, but

10  would you agree with me that if you were

11  required by a corrections officer to work that

12  in and you did and someone else could see that

13  occurring by happenstance, that that would be

14  embarrassing?

15          MR. CORTES:   Objection.

16      You may answer.

17      A.    So the question is -- can you just

18  repeat the question?

19      Q.    Sure.  If you're given an order --

20      A.    Right, right.

21      Q.    -- if you're given an order --

22  we'll preface this a better way.  If you're

23  given an order in the house of correction by a

24  corrections officer, you've got to do that.

25  Isn't that true?

1        A.      That's how it normally works.

2        Q.      And if you don't do it and you --

3    you know, ordinarily you'd be given an

4    opportunity to comply again before they start

5    taking negative action against you, right?

6        A.      Ordinarily.

7        Q.      Yes.  If somebody says to you --

8    I'll give you an example.  We talked about it a

9    couple days ago.  It's 9:30 at night.  Lock-in

10   is ordinarily at 10 but tonight it's going to

11   be 9:30, because they have to wax the floors or

12   clean up or whatever it is.  So the corrections

13   officer says to all the inmates, "Okay.  We

14   have to lock in."  Everybody is watching

15   Friends or whatever it is on TV and they don't

16   want to lock-in, because that TV show is off at

17   10:00.  They're like, You know, we don't want

18   to lock-in yet.  You know, we're not locking

19   in.  We don't have to lock-in until 10.

20        The corrections officer goes back there

21   and says, "You need to lock-in.  We're cleaning

22   up tonight.  You have to go into your dorm,"

23   or, "You have to go back to your bunk," because

24   you stay in bunks.  Okay.  So at that point in

25   time if an inmate doesn't do what he's told or

Page 39

1   he or she is told, then they could be subjected

2   to administrative discipline, couldn't they?

3       A.    It's -- that may possibly be.

4       Q.    All right.  I mean, you're told to

5   go to bed and you won't and you're sitting

6   there and you continue to refuse to go to bed,

7   you're going to be disciplined, aren't you?

8           MR. CORTES:   Objection.  Asked and

9   answered.

10       You can answer.

11       A.    Well, I believe it depends on the

12   circumstance.  I mean, each one is unique.  You

13   can't always apply the same measure to each

14   situation.  I mean, at first you could face

15   administrative discipline.  They could maybe --

16   maybe the person just needs to talk for a

17   little while and then they calm down.  It

18   depends.

19       Q.    All right.  You would agree that if

20   at some point the inmate doesn't calm down and

21   refuses to go to bed, ordinarily they're going

22   to be disciplined for doing that?  Would you

23   agree with me there?

24       A.    Ordinarily if the person continues

25   to defy something and create a disturbance

1  then, yeah.

2       Q.    All right.  Let's put yourself in

3  the shoes of the detainee coming in here who's

4  told to work this solution into their pubic

5  hair and, you know, they're given an order by a

6  corrections officer.  Ordinarily those orders

7  have to be followed.  Fair to say?

8       A.    They're there to serve as

9  direction, yeah.

10      Q.    So you receive direction to work

11 this stuff into your pubic hair, while someone

12 else is sitting in the shower taking a shower.

13      A.    Not the same shower.  You're

14 talking in the middle.

15      Q.    Well, it's not a very big room.

16      A.    No.

17      Q.    So if you really wanted to look

18 from the other two ends, you could do it --

19 it's not that hard -- or you could see if you

20 just stepped out.  But let's just use the

21 middle shower.  Someone is in the middle

22 shower.  They're taking a shower and you're

23 standing there on the mat over the drain and

24 you got someone spraying delousing solution on

25 you and you're sitting there with someone else

Page 41

1  right in the neighboring shower working this

2  stuff into their pubic hair.  That's going to

3  be pretty humiliating, isn't it?

4            MR. CORTES:   Objection.

5       You may answer.

6       A.     Personally, not necessarily.  I

7  mean, I'm in an institution being given an

8  order, following a procedure that everyone else

9  does.  It's not something I would choose to do

10 on a Saturday night, but given those

11 circumstances, I mean, it's part of the

12 program.

13      Q.    Well, let's take this one step

14 further.  What would the difference be between

15 having someone hosed down with this pressurized

16 spray can and just giving them the solution and

17 asking them to apply it themselves?

18      A.     The difference would be -- I think

19 the spray is faster, easier.  I'm not quite

20 sure of the difference.  I mean, the end

21 result -- I mean, if the person distributed

22 it -- if it was handed to someone and

23 distributed evenly everywhere and applied

24 everywhere -- as a spray you would -- then the

25 result may not be different.  If a person was

Page 42

1    given it and they just threw it on their legs

2    or they just put it on their upper torso and

3    they didn't bother with their lower torso and

4    they felt they didn't need to do their back,

5    only their front then, I mean, it would not be

6    effective if the person were infested.

7         Q.    Let's assume the person applies it

8    properly in a manner in which the corrections

9    officer wants them to do so.  There would be no

10   difference between them applying the solution

11   themselves and being sprayed down with a

12   pressurized spray cannister, would there?

13             MR. CORTES:  Objection.

14        You can answer.

15        A.    I really don't know of the

16   effectiveness of hand application versus spray

17   application on delousing chemicals.  I do know

18   that I could not possibly expect everyone to do

19   as good of a job as everyone else.  I do know

20   that lice is considered a communal infection.

21        Q.    Fine, but you didn't answer my

22   question.  If you're given the solution and

23   told by a corrections officer, "Apply this to

24   your body.  Here's the solution and I'm going

25   to stand here and watch you do it and make sure

1   you do it appropriately," so the corrections

2   officer watches and the detainee applies it in

3   the way that it's suggested -- they put it into

4   the hair and massage it in.  They put it into

5   the pubic hair and massage it in.  If they have

6   armpit hair, they put it in their armpits and

7   massage it in.  If they have, you know, a lot

8   of body hair, they take it and they apply it to

9   their body hair.  So they do everything that

10  they're supposed to do to the corrections

11  officer's direction -- there would be no

12  difference between giving them the solution to

13  apply it to themselves and having them sprayed

14  down with a pressurized spray cannister, would

15  there?

16          MR. CORTES:   Objection.

17      You can answer.

18      A.   I can't form a medical opinion on

19  this.  I couldn't tell you if medically it

20  would or would not be more effective using your

21  hand versus having it sprayed on you.

22      Q.   I'm not asking for a medical

23  opinion.  I'm asking for your opinion given

24  your training and experience as the former jail

25  manager at the house of correction.

1      A.    If I did everything perfectly well,

2  I suppose it would be as effective.  If I was

3  completely dedicated to that and did a

4  wonderful, perfect job, I suppose I could hit

5  every inch of my body, although I may not be

6  able to reach some parts of my body.  So I'm

7  not sure I would be necessarily capable of

8  doing that, like the upper back and places like

9  that.  I mean, that's not always --

10      Q.    All right.  You're not aware that

11  the testimony in this case is that the only

12  places that it's sprayed were the hair and the

13  genitals, are you?

14      A.    I've not read any of the court

15  proceedings, no.

16      Q.    Well, the testimony taken over the

17  past several days has been universal that what

18  happens is, it's not a head-to-toe spray, at

19  least according to that testimony.  I guess

20  we'll have to leave that for later proceedings,

21  as to what this actually is, but the testimony

22  was that it was only sprayed at the pubic hair

23  and it was sprayed at the back of the head and

24  then was sprayed on the buttocks.  So you would

25  agree with me that an ordinary size person, you

1   know, that's, say, under 400 pounds is going to

2   be able to wash their own buttocks, right?

3                MR. CORTES:  Objection.

4        You can answer, if you know.

5        A.    An ordinary person with ordinary

6   health should be able to.

7        Q.    Right.  And an ordinary person of

8   ordinary health should be able to wash their

9   genitals, right?

10               MR. CORTES:  Objection.

11       You can answer.

12       A.    Yes.

13       Q.    And an ordinary person of ordinary

14  health should be able to wash their hair?

15               MR. CORTES:  Objection.

16       You can answer.

17       A.    That's been my experience.

18       Q.    All right.  So if you're only

19  getting sprayed on the hair and in the pubic

20  hair and on the buttocks, there would be no

21  difference between somebody applying this stuff

22  to themselves, if they're doing it right, and a

23  corrections officer spraying them down, would

24  there?

25       A.    Well, only if the person applied it

Page 46

1   completely properly and I can't say that

2   medically, but personally, I mean, you'd have

3   to perfectly apply it one hundred percent.

4         Q.    Okay.  Do you know if the solution

5   in this case was applied pursuant to the

6   manufacturer's directions?

7         A.    The case in question?  No.

8         Q.    Do you know if the manufacturer's

9   directions for the use -- well, you're aware

10  the spray was called Liceall?

11        A.    I don't really recall the name, the

12  actual chemical.

13        Q.    Do you remember it was a white

14  bottle with a blue label?

15        A.    I don't recall, not with any

16  specifics, no.

17        Q.    All right.  Well, there's no

18  dispute in this case that the solution that was

19  being used to delouse detainees at the

20  Cleveland workhouse was called Liceall.  It's

21  from a company called Bob Barker --

22        A.    Okay.

23        Q.    -- I believe they're either in

24  Indiana or Kentucky.  Mr. Cortes was gracious

25  enough to produce a bottle of this.  I've seen

1  bottles of it in cases I've been working on.

2  So I'm asking you -- you're talking about

3  perfect applications and the like -- do you

4  know if this stuff was applied as required by

5  the manufacturer to be effective?

6       A.    My understanding is that they --

7  the policy -- that the officers were to follow

8  the directions.

9       Q.    All right.  And how long would the

10  delousing solution remain on somebody until

11  they wash it off?

12       A.    I do not know.  I believe it was

13  very brief.

14       Q.    Okay.  Was there ever a follow-up

15  application of delousing solution seven to ten

16  days later?

17       A.    No.  I understand that if a person

18  outside of this does present themselves to one

19  of the nurses or medical professionals, they

20  have chemicals and shampoos they can use.  We

21  had that downtown with the nurse.

22       Q.    Well, if someone was found to have

23  lice downtown, what would the nurse do in

24  response to that?

25       A.    It would depend.  Normally they

1   have shampoos, medical -- you know, shampoos.

2   They would shower and their bedding would be

3   changed, their clothing would be changed.  They

4   would be reexamined by the nurse.

5           Q.    The shampoo, who would apply it?

6           A.    In that case, the inmate.  We don't

7   have any sprayers downtown.

8           Q.    Okay.  So if an inmate is found to

9   have lice downtown, they're given the shampoo

10   and told to apply it themselves?

11           A.    Yes.  We wouldn't touch them.

12           Q.    And then if they have pubic lice,

13   the same thing.  They would be given whatever

14   treatment there would be for pubic lice and

15   they would apply that to themselves, true?

16           A.    Right.  Whatever the nurse directs.

17           Q.    So why downtown would the nurse

18   have supervised delousing and out at the

19   workhouse we had this broad delousing regimen

20   where it was done to everybody?

21           A.    I understand that at the workhouse,

22   people are housed together for extended periods

23   of time, large numbers of people in common

24   rooms.  At the city jail, people are housed one

25   or two people in a cell at a time for short

Page 49

1   periods of time --

2        Q.    Okay.  I understand.

3        A.    -- you have to understand; at the

4   workhouse everyone is screened medically.

5   There are procedures in place to prevent any

6   sort of outbreaks.

7        Q.    Why wasn't it appropriate at the

8   workhouse to give detainees the delousing

9   solution and allow them to apply it to

10  themselves in private as part of the intake

11  procedure?

12       A.    I don't know.  That was something

13  that was established, my understanding under

14  the department of public health years ago as

15  the best practice, but I couldn't give you the

16  reason.

17       Q.    Could you explain to me why at the

18  Justice Center, if a detainee is discovered to

19  have lice, they're given the solutions to treat

20  that and allowed to apply that privately and

21  yet at the workhouse, everyone is subjected to

22  what's been described as the hose method, where

23  they're sprayed down with a pressurized spray

24  cannister full of delousing solution?  Can you

25  explain to me the difference there?

```
 1        A.    My understanding is that they've
 2   had numerous infestations at the workhouse that
 3   led to that policy where dozens -- hundreds of
 4   people would be infected by lice and it was a
 5   very -- this is just hearsay.  I don't have
 6   anything from before I worked there, but entire
 7   dormitories with a hundred people would be
 8   infected with lice.  It was a really terrible
 9   situation.  At the Cleveland City Jail, folks
10   were isolated.  They were in individual cells.
11        Q.    Well, I think you kind of missed
12   the import of my question.  I'll try to do a
13   better job.
14        A.    I'm sorry.  I apologize.
15        Q.    If inmates who actually have lice
16   are trusted to apply delousing chemicals to
17   themselves at the Cleveland City Jail, why are
18   detainees at the house of correction not given
19   the same courtesy to be allowed to apply the
20   delousing chemicals to themselves?
21             MR. CORTES:   Objection.
22        You can answer.
23        A.    Well, I know we don't have a
24   sprayer downtown, so it's not even an option.
25   We have a shower where you can -- you know,
```

Page 51

```
1   it's private, but we don't have a sprayer.  The
2   medication is distributed by the nurse as
3   needed, not on mass.  I don't have a sprayer.
4   There's no way I could spray you if I don't
5   have a sprayer.  I mean, either I touch you or
6   you touch yourself.  We never touch people
7   unless it's necessary downtown.
8        Q.    So what's the explanation for
9   touching them at the workhouse?
10       A.    My understanding is there was no
11  touching at all.  That's why the sprayer was
12  employed.
13       Q.    Well, that is touching.  If you're
14  spraying -- and that's what the sixth circuit
15  court of appeals said, is that spraying
16  solution on someone's penis is touching them.
17  Just because you're not physically reaching out
18  and grabbing doesn't mean you're not making
19  contact through another object.
20       So let's be clear.  They're trusted to
21  apply the delousing solution downtown if they
22  actually have lice, but out at the workhouse
23  they're not trusted to apply it themselves and
24  I'm trying to figure out the dichotomy and I'm
25  going to invite you to explain it to me.  Why
```

Page 52

```
 1    would you trust them one place when you know
 2    that -- and we'll get into this in a moment --
 3    we know that person has lice and yet you trust
 4    them to address the treatment themselves, but
 5    out at the workhouse, you do not trust them to
 6    apply the treatment themselves.
 7              MR. CORTES:  Objection.
 8         You can answer.
 9         A.   My understanding is at the
10    workhouse, it's standard uniform policy for all
11    new admittees to prevent any infestation.  It's
12    a health concern they have.  And at the city
13    jail, it's a case-by-case basis depending on
14    whatever particular health problem a person may
15    or may not have.
16         Q.   Well, you still haven't answered my
17    question.  I'll do a better job of building up
18    the foundation.  There's no determination made
19    at the workhouse or at the time that this
20    delousing procedure was going on --
21         A.   At that time.
22         Q.   Yeah.
23         -- there was no determination made when
24    looking at a detainee to determine whether or
25    not they have lice.  Fair to say?
```

```
                                              Page 53
 1          A.     In general or --
 2          Q.     I mean, as part of this delousing
 3   procedure.  It was done on everybody, wasn't
 4   it?
 5          A.     Right, right.  It was uniform.
 6          Q.     And there was no effort made to
 7   determine by looking at somebody whether or not
 8   that person had lice, true?
 9          A.     I've never heard any of the
10   officers examining any of the inmates when they
11   arrive for that.
12          Q.     Okay.  It was done to everybody
13   uniformly whether there was a belief they had
14   lice or not.
15          A.     It was a standard procedure, right.
16          Q.     So I appreciate you clarifying for
17   me.  Down at the Justice Center people are
18   generally held in cells of one by themselves or
19   with one other person?
20          A.     One to two people in a cell
21   anywhere from a few hours to two, three days at
22   the most.
23          Q.     So you don't have the same sort of
24   communal facility down at the city jail like
25   they have out at the workhouse.  Fair to say?
```

1       A.      Correct.  We have no communal

2   facilities downtown, except maybe a holding

3   cell if you were on your way to court, let's

4   say.

5       Q.      All right.  We'll do some role

6   reversal here.  Let's assume I'm the guy that

7   was upset that the Cavs lost the NBA Finals,

8   and I was.  Even though I'm not from Cleveland,

9   I was legitimately upset because I want --

10      A.      Thank you for being a Cavs fan.

11      Q.      Yeah.

12      -- I want to see LeBron bring home a

13  title to Cleveland, but regardless, let's

14  assume I'm the guy.  I'm down at the Hard Rock

15  Cafe.  I'm rooting for the Cavs.  It's game 6.

16  They lose to the Golden State Warriors and I

17  get really upset and smash my beer stein on the

18  ground, jumping up and down, screaming,

19  throwing stuff.  I get arrested.  I'm a lawyer

20  from Upstate New York.  I have no criminal

21  history.  You know, I guess by some standards

22  anyway, a well to do guy, never had lice, never

23  had any hygiene problems, been married for

24  twenty years.  I'm going to go to the holding

25  center.  I'm going to be held for a little

Page 55

1    while --

2         A.    Sure.

3         Q.    -- you know, I'm at the Justice

4    Center.  I'm going to be held and arraigned,

5    see a judge.  I don't have $1,000.  I head out

6    to the workhouse.  What's the basis to believe

7    that a guy like me would have lice on himself?

8              MR. CORTES:   Objection.

9         You may answer, if you can.

10        A.    Well, my understanding is that is

11   something that's done to everyone who

12   arrives -- at that time it was done to everyone

13   that arrived there.  There was no

14   discrimination.  There was no interviews.

15   There was no background checks, no calling

16   families or personal doctors asking about

17   people's history.  It was just done across the

18   board.

19        Q.    I understand that.  And I'm just

20   trying to figure out:  Looking at me in the

21   circumstances I just described, would you think

22   I'm a person that has head lice?

23              MR. CORTES:   Objection.

24        A.    You specifically, as well as I know

25   you from today?  I would be -- it's possible,

Page 56

1   but I would be very shocked and surprised.  I
2   would think that you per se wouldn't.
3          Q.    How about pubic lice?  From looking
4   at me, you know, with the circumstances I gave
5   you, would you think I'd have pubic lice?
6               MR. CORTES:   Same objection.
7          Go ahead and answer, if you can.
8          A.    I really wouldn't know.  I would
9   think not, but I wouldn't know.  I mean, I
10  would be shocked if you did, but I can't judge
11  you.  I mean, I wouldn't judge you.
12         Q.    That's okay.  That's fine.
13         A.    Okay.
14         Q.    All right.  So you and I can agree,
15  someone like me --
16         A.    The all powerful attorney who's an
17  important figure is not likely to have it.
18  It's certainly possible but not likely.
19         Q.    So if it's unlikely that I have
20  that condition, then why would I be subjected
21  to this regimen where I got a stranger spraying
22  a stream of delousing solution on to my penis
23  and my genitals and on to my head?
24         A.    My understanding is that the
25  corrections officer working there was not

Page 57

1  entitled to a medical opinion on each person as

2  they came in, was not skilled or trained to

3  examine people for any sort of infestations or

4  health problems, was not given the discretion

5  to decide who they thought was okay and who

6  wasn't okay, but they were told to treat

7  everyone the same.

8          Q.    Fair enough.  So someone who

9  actually has lice that a medical professional

10  has looked at to determine has lice is trusted

11  at the Justice Center to apply the delousing

12  chemicals to themselves.  That's your

13  testimony, right?

14          A.    That's the best option we have.

15          Q.    Well, there are other options.

16  Corrections officer could tie them down and

17  apply the solution themselves, right?

18              MR. CORTES:  Objection.

19          Go ahead.

20          A.    Well, a use of force is always a

21  last resort and rarely necessary.  I, myself,

22  might send someone to the hospital first,

23  before doing anything like that.

24          Q.    All right.  I appreciate that.  I'm

25  not -- you know, I think -- I don't know if

Page 58

1   indignation is the right description, but

2   clearly I'm not suggesting that you would do

3   that.  I understand you were only there for a

4   few months, so I just want to make that clear.

5   I'm not blaming you for this situation.  This

6   is a policy and practices of the City of

7   Cleveland that goes back apparently beyond 1992

8   that nobody can tell me the impetus of.  I just

9   want to clarify that.  I understand you

10  wouldn't do that to somebody.

11        I'm not suggesting you would, but there

12  are other methods to delouse somebody if you

13  know they have lice, aren't there?  You could

14  require them to stand there and have the nurse

15  apply the solution.  Fair to say?

16             MR. CORTES:  Objection.

17        Go ahead.

18        A.    I suppose that's possible.  I don't

19  have any knowledge or training of delousing per

20  se medically, but, I mean, I'm sure there's a

21  nurse who could do something like that if they

22  had to at a hospital.

23        Q.    Or you could get the spray can down

24  at the Justice Center and you could spray

25  people down down there, right?

```
                                                        Page 59
 1              MR. CORTES:  Objection.

 2        Go ahead.

 3        A.    That never happened.  It was never

 4   an option.

 5        Q.    I understand you didn't have one.

 6   I'm saying:  It's possible you could have gone

 7   out, for instance, to Ace Hardware, purchased

 8   an Ace Hardware lawn and garden spray can,

 9   filled it up full of delousing solution and

10   sprayed it on people if you chose to do so,

11   right?

12        A.    If it was something the medical

13   director recommended and approved, it's

14   possible then.

15        Q.    All right.  So none of those other

16   methods were used.  The method that was used at

17   the Justice Center was to give the inmate the

18   solution and trust them to apply it themselves

19   and trust them to want to take care of their

20   own health enough to put it on properly.

21        A.    That was on an individual basis,

22   yes.

23        Q.    So with that concession being made

24   at the Justice Center, why wasn't the same

25   courtesy given to people at the workhouse with
```

Page 60

1  basically saying to them, We need to delouse

2  you.  We've had problems in the past with lice.

3  We want to make sure you don't bring any lice

4  into the facility.  Here's delousing shampoo.

5  Please go and apply this to your hair and then

6  rinse it out?

7           MR. CORTES:  Objection.

8       Go ahead and answer.

9       A.    My best understanding is that at

10  the workhouse or Cleveland House of Correction,

11  they're dealing with groups of folks who are

12  coming in.  Not everybody perhaps is

13  cooperative.  They had just come from court.

14  Large numbers of people at the same time.

15      Q.    I understand you had a lot of

16  people down at the Justice Center, too, right?

17      A.    Well, we don't normally -- I mean,

18  the issue of lice does come up from time to

19  time, an actual infestation, but it's not a

20  daily occurrence at the Justice Center, but it

21  comes up now and then.

22      Q.    But this is the City of Cleveland.

23  This is a major urban area.  You take in

24  hundreds of arrestees a day down at the Justice

25  Center.

Page 61

1          A.     We can.

2          Q.     So, again, I'm asking you -- I'm

3     going to open the floor to you as a fellow

4     attorney.  Please explain to me the dichotomy

5     between allowing someone to take care of their

6     own health needs at the Justice Center by

7     applying delousing solution to themselves when

8     they actually have lice and then taking

9     somebody where there's no knowledge that they

10    have lice and forcing them to be compulsorily

11    deloused using a spray cannister instead of

12    just giving them the stuff themselves.  I can't

13    reconcile those two separate policies.  I'm

14    asking you to help me.

15               MR. CORTES:   Objection.

16         Go ahead, if you know.

17         A.     You're asking my opinion then?

18         Q.     Well, I'm asking you to -- I mean,

19    you still work for the division of corrections.

20         A.     Right.

21         Q.     Why is there these different

22    policies between facilities?  Why do you trust

23    inmates to care for themselves at one place,

24    but you don't trust them to care for themselves

25    in another, especially when the one place, you

Page 62

1  know, they've got lice and at the other place

2  you don't really know?

3            MR. CORTES:  Continuing objection.

4       Go ahead, if you can answer.

5       A.    My personal best understanding is

6  that we're dealing with two different

7  situations, two different operations with

8  differing needs.  We're dealing with downtown

9  where you have an individual, case-by-case

10 basis for someone who may be found by the nurse

11 to have an infestation, and that is dealt with

12 the best way they can, versus we have another

13 place that's an institution where they deal

14 with large numbers at one time.

15      Mind you, the people who go to the

16 workhouse, they're not coming in all day and

17 night.  They're coming in large groups.  They

18 go to communal areas almost all the time unless

19 they're in some sort of lockdown.  They are

20 constantly in close quarters and it's a

21 completely different sort of operation.  That

22 is more of a traditional long-term institution,

23 at the workhouse, while the city jail is more

24 of a short-term lockup.  So they're not the

25 same place.

```
                                                Page 63
 1          Q.     I understand all that --
 2          A.     Okay.
 3          Q.     -- and I understand they're
 4     different departments.
 5          A.     Right.
 6          Q.     So is that the justification you're
 7     providing me where at one location you trust an
 8     inmate to care for themselves and at another
 9     location they get hosed down?
10          A.     I don't trust anyone, to be honest.
11     That's something I've learned.  I don't trust
12     anyone.  The people downtown who are given the
13     solution and who shower and they have their
14     clothing changed, their bedding changed, they
15     go back to the nurse to be checked again and
16     again.  If the infestation is there, they can
17     be sent out to the hospital.  The nurse can
18     speak with them.  It's not really about trust.
19     It's about preventing some sort of outbreak at
20     either location.
21          Q.     Well, what would you call it?  If
22     you don't call it trust the inmate is given the
23     opportunity to care for themselves versus trust
24     that they care for themselves?  I mean, how
25     would you describe that?  The nurse gives the
```

Page 64

1    inmate the solution at the Justice Center and

2    says, "Put this on yourself.  You have pubic

3    lice.  Put it on your pubic hair.  You have

4    head lice.  Put it on your hair."  What would

5    you call that?

6                MR. CORTES:   Objection.

7         A.    I would call it something that has

8    to be done.  If a person refuses to apply the

9    lotion, they would have to be seen by the

10   nurse.  They may be lock -- they may face

11   administrative results.  They may be placed in

12   isolation.  They may not be allowed phone calls

13   and visits because they could infect others

14   with that, even downtown, even downtown.  It's

15   about safety.

16        Q.    I understand it's about safety.  I

17   mean, you're still not answering my question.

18   What do you call it if the nurse says to an

19   inmate, "You have a health problem.  Here's the

20   solution.  It's a chemical solution.  Put it on

21   your body.  Go in there and take care of it.

22   Take a shower.  Here are the instructions that

23   you need to follow"?  What do you call that --

24               MR. CORTES:   Objection.

25        Q.    -- if you don't call it trusting

                                                    Page 65

1   the inmate to care for themselves, what do you

2   call it?

3                MR. CORTES:  Objection.

4        Go ahead.

5        A.     It sounds like they're being told

6   to do something in the facility that they're --

7   the nurse does not go to the shower with them.

8   The corrections officer does.  They're there

9   not looking at them while they're doing this

10  but they're there.  They're making sure that

11  they're showering.  They're being given an

12  order to do that.  They're being given advice

13  by the nurse to do that.  The guards are giving

14  them an order.

15       Q.     So they're given an order by a

16  nurse and they're trusted to follow the order.

17  Fair to say?

18       A.     They're expected to follow the

19  order.

20       Q.     They're expected to follow the

21  order.  Okay.  So why aren't detainees at the

22  workhouse given the same expectation, that they

23  can be told, "Here's the solution.  You need to

24  put it on yourself.  Here's what you need to

25  do.  Please go in the shower and do this"?

```
                                              Page 66

 1              MR. CORTES:  Objection.  I believe

 2    it's been asked and answered numerous times.

 3          But if you have an answer to provide, go

 4    ahead.

 5          A.     Just that that is the -- that's the

 6    established policy of the workhouse.  And given

 7    that there are conditions as they are, that's

 8    the most effective way of ensuring that.

 9          Q.     The most effective way of ensuring

10    that.  Okay.  I feel like I'm starting to beat

11    this horse.

12          A.     Yes.

13          Q.     I have a feeling if I see you

14    again --

15          A.     I'm here all day.

16          Q.     No, no.

17          -- if I see you again, you're not going

18    to have as easy a time in answering my

19    questions the way that you are in federal court

20    in front of a judge.  But regardless, we are

21    here today without my opportunity to get a

22    judge to give you instructions about how to

23    answer questions.  So I'll just say this, you

24    know, one more time:  At the Justice Center,

25    the most effective way to deal with this is to
```

```
                                              Page 67
 1   take the inmate who actually has lice and allow

 2   them to apply the solution to themselves to try

 3   to rectify their condition, correct?  That's

 4   the most effective way because the nurse gets

 5   involved and that's what the nurses do.

 6        A.    That's --

 7             MR. CORTES:  Hold on.

 8        Continuing objection.  I'll let you go

 9   through it so hopefully we can move on to a new

10   topic.

11             MR. KEACH:   Okay.

12        A.    That's the normal procedure.

13        Q.    But out at the workhouse, there's

14   no nurse involved.  There's no determination

15   that someone has lice and there's no

16   opportunity for a detainee to be given the

17   opportunity to apply the solution to

18   themselves.  Fair to say?

19        A.    That was the normal procedure.

20        Q.    Okay.  That was the procedure.  I

21   understand you're not responsible for that

22   procedure.

23        A.    Sure.

24        Q.    We can agree?

25        A.    Correct.
```

Page 68

1          Q.     That existed before you came there.

2          A.     Correct.

3          Q.     All right.  You worked as a

4    supervisor and jail manager at both facilities,

5    so I'm asking you:  Why is there a different --

6    give me every reason why there's a difference

7    in treatment at the Justice Center where

8    inmates are allowed to apply this to themselves

9    after they're determined they actually have

10   lice and yet detainees at the house of

11   correction, who more likely than not don't have

12   lice, are required to be hosed down using a

13   pressurized spray cannister?

14              MR. CORTES:  There's a continuing

15   objection.

16        You can answer his question, if you can.

17        A.     As well as I can.  I mean, I

18   understand there were two different procedures

19   going on at two different places.  My

20   understanding is that's the reason why.  What

21   may work in one place isn't necessarily going

22   to work in another.  We did not have individual

23   bottles at the workhouse to give to people.  We

24   had the sprayer that had been in place and that

25   was being used.  The agent -- the medicine that

1    came was for the sprayer in large quantities,

2    not in small bottles like downtown.  That's the

3    procedure that had been in place for years.

4         Q.    No reason why they couldn't have

5    bought Dixie cups or something or -- I don't

6    know what you call those.  Specimen cups.  You

7    know, like the little white things you get.

8    Don't they hand out drugs that way in

9    correctional facilities?  They give you a

10   little specimen cup with your drugs and make

11   you swallow them in front of the CO.  Have you

12   seen that?

13        A.    Yes.

14        Q.    Are they specimen cups?  Are they

15   like little white cups with ridges or are they

16   like Dixie cups?  Or how does that happen when

17   people get their prescription medications?

18        A.    I've seen the nurse use small cups,

19   maybe an ounce or two size.

20        Q.    So there's no reason why they

21   couldn't get those cups and put them in the ID

22   unit, is there?

23             MR. CORTES:  Objection.

24        Go ahead.

25        A.    I don't know if that would have

1    been effective or not.  I don't know

2    anything -- I don't know anything about the

3    chemical or how it's -- anything about the

4    chemical.  I mean, there's many things that

5    could be possible, I'm sure --

6         Q.    All right.

7         A.    -- fill a bathtub with the stuff.

8    We don't have that.

9         Q.    But that's certainly possible, if

10   they wanted people -- if someone chose to do

11   that, they could get those little applicator

12   cups down there, right?

13        A.    It would be possible.

14        Q.    So the only justification you can

15   provide me for the difference in treatment from

16   the Justice Center to the workhouse is the fact

17   that they're just different facilities, had

18   different policies and have different needs.

19   Is that a fair summary of your testimony?

20        A.    Yes.  We're dealing with somewhat

21   different circumstances and that's why -- my

22   understanding is that's why the procedures are

23   different.

24        Q.    Why were the procedures changed in

25   April of 2010?

```
                                                Page 71

 1          A.    I don't know.  I was told, as you

 2    see in the email, to change that, but I was

 3    never given an explanation or asked my opinion.

 4          Q.    So did you ever ask Jackie Lewis

 5    why the change was made?

 6          A.    No.  I told her I had done so and

 7    she said, "Good."

 8          Q.    That was it?  That was the entire

 9    conversation you had with her about making that

10    change in policy?

11          A.    I don't remember the exact

12    conversation, but I know I was never given any

13    sort of explanation or given documentation or

14    anything of that nature.  I was just told to do

15    it.

16          Q.    Do you know why that's the case

17    now?

18          A.    At this time?

19          Q.    Yes.

20          A.    I believe a complaint was filed.

21          Q.    Meaning a federal complaint?

22          A.    This complaint.

23          Q.    This complaint.

24          A.    Yes.  I mean, everything that led

25    to this.
```

```
                                            Page 72
1        Q.    Well, did it cause you any concern
2   that Jackie had directed you to change the
3   policy?
4        A.    No, no.  That's why I told her I
5   had done that.  And in doing so, I asked for
6   confirmation that that is what was wanted and
7   she said, "Yes, good," so.
8        Any concern you said?  It did actually
9   cause me concern.  I really didn't answer that
10  fully --
11       Q.    Okay.
12       A.    -- I had some concern because I was
13  afraid, well, we could face a possible outbreak
14  of lice or whatnot.  At that point it would
15  depend on each person and a nurse detecting
16  this, you know, as soon as possible --
17       Q.    Okay.
18       A.    -- so I had that concern.
19       Q.    Did you have any outbreaks after
20  the change was made?
21       A.    Not while I was there.
22       Q.    Do you know if there were any after
23  you left?
24       A.    I don't know.
25       Q.    What did you review to prepare for
```

```
                                                    Page 73
 1   your testimony today?
 2          A.     I reviewed nothing.
 3          Q.     Who did you talk to prepare for
 4   your testimony today, besides Mr. Cortes?
 5          A.     Besides Mr. Cortes, I spoke to no
 6   one.
 7          Q.     Have you looked at any of the
 8   transcripts in this case?
 9          A.     I have not.
10          Q.     Have you looked at any of the legal
11   pleadings?
12          A.     No.
13          Q.     Have you looked at any of the
14   decisions from either the northern district of
15   Ohio or the sixth circuit court of appeals?
16          A.     No.
17          Q.     So after you made this change --
18   well, first off, you indicated to me you're not
19   a doctor.  Neither am I.
20          A.     Right.
21          Q.     You don't have any knowledge about
22   whether or not this procedure would have
23   actually done anything to eradicate lice, do
24   you?
25          A.     My understanding is that outbreaks
```

Page 74

1    were not common, so there could have been a

2    correlation.

3          Q.    And there could be no correlation.

4    We don't know.  Fair to say?

5          A.    I can't factually establish that,

6    no.

7          Q.    All right.  I took testimony from

8    Lieutenant Flowers.  He's the current jail

9    manager at the workhouse, isn't he?

10         A.    Correct.

11         Q.    Very amiable guy.  I enjoyed

12   meeting him.  He testified there have been no

13   outbreaks at the workhouse from 2011, when he

14   took over as the jail manager, until today,

15   when he was deposed and that they had a system

16   in place where they had medical intervention

17   and the nurse took care of things.  So if

18   outbreaks are infrequent now without any

19   delousing regimen in place, you and I can agree

20   that we don't know if there's a correlation

21   between the delousing regimen and no outbreaks

22   or not, do we?

23               MR. CORTES:  Objection.

24         Go ahead.

25         A.    It seems as though they were

1    concerned.  And as you just said, they

2    implemented other procedures to try to get on

3    something like that as soon as they could.

4          Q.    Okay.  They implemented alternative

5    procedures --

6          A.    And they've been fortunate so far.

7          Q.    All right.  They've implemented

8    alternative procedures that seem to be just as

9    effective.  Fair to say?

10          A.    I can't judge their effectiveness.

11    I'm glad they haven't had a major outbreak.

12    I'm sure there have been instances, but I

13    can't -- I don't have any facts on that.

14          Q.    All right.  Are detainees provided

15    with nit combs, when they come in to the

16    workhouse?  You know what a nit comb is?

17          A.    Um-hum.

18          Q.    Are they provided with nit combs?

19          A.    My understanding is they're

20    available.

21          Q.    They're available to people who

22    actually have a lice infestation.  Fair to say?

23          A.    Correct.

24          Q.    I'm talking about everybody that

25    came in.  There was the assumption that

1    everybody coming in had lice.  That's why

2    everybody had to be deloused.  Fair to say?

3         A.    It was a precaution, yes.

4         Q.    Yeah.  The precaution was, We're

5    going to assume everyone has got lice, so we're

6    going to delouse them when they come in --

7         A.    The assumption is that --

8         Q.    -- as a precautionary measure to

9    prevent lice.

10        A.    I didn't mean to interrupt.

11        Q.    It's okay.

12              MR. CORTES:  I'll object.

13        Q.    I didn't do such a hot job of

14    phrasing my question anyway.  But you

15    understand it?

16        A.    Yes.

17        Q.    Can you answer it?

18        A.    Well, I understood that there was a

19    presumption that anyone could have lice and the

20    nit combs were for anyone who was at risk or

21    had presented as having lice.  Then those were

22    freely provided to folks if they had, you

23    know -- if anything was detected.  So nit combs

24    were beyond precautionary.  That was actual

25    treatment.

Page 77

1          Q.     For someone who did not actually

2    have lice, was there a second application of

3    the Liceall delousing solution?

4          A.     I'm not aware.

5          Q.     Did you take any extra measures in

6    your brief tenure as the jail manager out at

7    the house of correction, once Jackie Lewis came

8    down and said, "We're going to stop doing

9    this"?

10              MR. CORTES:   I'm going to object.

11   Can you maybe clarify what you mean?

12              MR. KEACH:    All right.

13         Q.     Every time that I seem to ask you a

14   difficult question, you look at Mr. Cortes.

15   Can you explain to me why you're doing that?

16   You've done that at least 200 times today.

17         A.     The reason I do that is, I want to

18   make sure counsel has the chance to object if

19   they feel the need.  Therefore, I pause and

20   then answer the question.  I don't want to just

21   run my mouth --

22         Q.     Okay.

23         A.     -- he's not coaching me.  I just

24   want to make sure he has the opportunity.

25         Q.     I didn't suggest that Mr. Cortes

1    was coaching you --

2           A.    Right.

3           Q.    -- and I'm not suggesting that

4    Mr. Cortes is coaching you.  I know in the past

5    I've been accused of coaching my witnesses and

6    it makes me very angry when people make a false

7    accusation.  So to the extent I did that, I

8    apologize.

9           A.    We certainly agree on that.

10          Q.    I just don't understand why you

11   keep looking at him and now you've told me it's

12   because --

13          A.    Yeah.

14          Q.    -- you think he should make an

15   objection, basically.

16          A.    No.  If he feels the need, I want

17   to give him a window.  That's all --

18          Q.    Okay.

19          A.    -- that's all.  I just, you know --

20   and it's also good to take a pause and then

21   answer the question to be as accurate as you

22   can.  So that gives me a chance to take a

23   little pause there.

24               MR. KEACH:    All right.  Before I

25   got on that topic, could you tell me what the

Page 79

1   question was?

2        (Record was read, Page 77, Lines 5-9.)

3             MR. CORTES:   And I just asked if

4   you could clarify.  That was the basis why I

5   interrupted.

6        Q.   All right.  I'm going to withdraw

7   and rephrase.  Jackie comes down with this memo

8   that says, "Stop delousing immediately."  What

9   did you do?

10       A.   At that point I made sure that each

11  and every supervisor was aware of that and they

12  could communicate it to their staff, that they

13  stopped it.  I followed up to make sure they

14  had stopped that practice and was satisfied

15  that they had.  By doing so, of course I made

16  sure that the supervisors were aware and their

17  COs were aware that we no longer had this

18  precaution for everyone coming in.  So I knew

19  based on my experience at that point, it would

20  be an additional concern, more of a concern for

21  them.

22       Q.   Okay.  I gotcha.  So did you then

23  put out or state to the supervisors, "Listen,

24  we're not going to be delousing anymore, so you

25  need to tell your subordinates to be more

Page 80

1   vigilant when assessing detainees to see if

2   they have the signs and symptoms of a louse

3   infestation"?

4       A.    I don't recall exactly what I said,

5   but I made sure they understood that it had to

6   be stopped and -- or at least for the

7   foreseeable future, had to be suspended or

8   stopped.

9       Q.    Okay.  But did you put in place any

10  additional preventative measures in response to

11  the fact that you couldn't delouse anymore?

12      A.    I didn't add any policies or

13  procedures or new methods.

14      Q.    So things just continued as they

15  did before, except that detainees were no

16  longer being deloused.  Fair to say?

17      A.    Correct.

18      Q.    I already addressed this, but want

19  to be thorough.  You never asked Jackie Lewis

20  for a justification about the policy change?

21      A.    No, no.

22      Q.    You were never given a

23  justification for the policy change?

24      A.    Right.  I asked, because I wanted

25  to be certain that I was understanding

```
                                              Page 81
 1    everything the way it was to be.  It was a very
 2    simple email, but it's always good to follow up
 3    with your boss.
 4         Q.    Right.  I don't disagree with that.
 5    At any point in time, other than when you
 6    learned about the lawsuit, were you given any
 7    justification for why that change was made?
 8         A.    When I learned about the lawsuit?
 9         Q.    Besides when you learned about the
10    lawsuit.
11         A.    Oh.
12         Q.    You said you learned about the
13    lawsuit; and based on that, it is your opinion
14    that's why the policy was changed.  But have
15    you received any justification from anybody,
16    besides learning about the lawsuit, that would
17    tell you why this change was made?
18         A.    No.  It was all in the context of
19    the lawsuit.
20              MR. KEACH:   We've been going for
21    a while.  I need to take a break.
22                   (Recess taken.)
23    BY MR. KEACH:
24         Q.    Sir, are you aware that detainees
25    go through what's called a clothing exchange,
```

1   what the City of Cleveland calls a clothing

2   exchange when they go through the ID unit?

3          A.    Yes.

4          Q.    And what is your understanding of

5   what the clothing exchange entails?

6          A.    It's an imperfect understanding.

7   I've never done it myself there.  I've never

8   been in that capacity, but my understanding is

9   the person would remove their clothing and be

10  issued additional clothing and then their

11  clothing would be put into property, their

12  property.

13         Q.    They would remove all of their

14  clothing in the presence of a corrections

15  officer, correct?

16         A.    That's my understanding.

17         Q.    And that would include for a male

18  his underpants?

19         A.    My understanding is everything.

20         Q.    Down to their naked body?

21         A.    Yes.  That's my understanding.

22  Again, I've never done it, but, yes.

23         Q.    I understand.  Your understanding

24  is -- and what you're testifying is what's been

25  testified about by a number of other

Page 83

1   individuals, so, you know.  But what your

2   understanding is, is that the detainee takes

3   all of their clothes including their underpants

4   off and are in a state of complete undress and

5   then would proceed at some point to put on the

6   jail uniform.

7        A.     Correct.

8        Q.     All right.  Back when delousing was

9   happening, the person would take off all their

10  clothes, be in a state of complete undress and

11  then have to go and be deloused in the shower

12  room.  Fair to say?

13       A.     I believe so, yes.

14       Q.     Were the clothing exchanges done on

15  an individual basis or were they done with

16  groups of detainees or did it depend?

17       A.     I'm not certain of that.  I would

18  say it depends, but I'm not a hundred percent.

19       Q.     It would depend on what?  How busy

20  the facility was?

21       A.     I really can't say.  I really

22  wasn't involved with that.

23       Q.     Okay.  There's been testimony from

24  others in this case that when the facility was

25  busy, it was routine that multiple detainees,

Page 84

```
 1    two or three, were brought back into the room
 2    where the clothing is.
 3          A.    Um-hum.
 4          Q.    Would you call that the clothing
 5    room?  Is that --
 6          A.    You could call it that, sure.
 7    That's a fair way to describe it.
 8          Q.    What would you call it?  I know you
 9    didn't work there long.
10          A.    Clothing room sounds fine, yeah.  I
11    mean, it was an adjunct of their property
12    procedure they had.
13          Q.    So they would bring two or three --
14          A.    It's a small little room.
15          Q.    -- two or three detainees back into
16    that room who would all be required to undress
17    at the same time.  There's been testimony about
18    that in this case.  Do you have any knowledge
19    of that?
20          A.    I don't.
21          Q.    Do you feel that's appropriate, to
22    have detainees disrobing in front of each other
23    at the same time without any sort of privacy
24    partition?
25                MR. CORTES:  Objection.
```

Page 85

1          You can go ahead and answer.

2          A.    I feel it's -- something that is

3     inappropriate, you asked?

4          Q.    (Nodding.)

5          A.    Not necessarily, no.  No, no.  I

6     have would say, no.  No.  You're in a facility.

7     If there's no physical touching, if people of

8     the opposite gender are not involved then, no.

9          Q.    Well, would you agree with me that

10    people in some circumstances -- well, let's

11    just say this:  You would agree with me, people

12    have different sensitivities to being naked in

13    front of other people depending on their

14    proclivities.  Fair to say?

15               MR. CORTES:  Objection.

16        Go ahead.

17        A.    My personal opinion, I would agree.

18        Q.    All right.  Some people don't have

19    a problem.  You know, maybe somebody that was

20    in the Army, they don't have a problem taking

21    off their clothes in front of somebody else

22    whereas someone who grew up in a conservative

23    christian family may have a different opinion.

24    Can we agree on that?

25               MR. CORTES:  Objection.

Page 86

1        Go ahead.

2        A.    I would say that everyone has

3   different body images.

4        Q.    So someone who is portly, like

5   myself, may be more reluctant to take off their

6   clothes in front of someone else than someone

7   who is in good shape?

8             MR. CORTES:  Objection.

9        Go ahead.

10       A.    No.  I think that's completely

11  personal.  It's an attitude people have.

12       Q.    How about somebody with a colostomy

13  bag?  You and I can agree somebody with a

14  colostomy bag might feel uncomfortable taking

15  off their clothes in front of someone they

16  don't know?

17            MR. CORTES:  Continuing objection

18  to this line of questioning.

19       You can go ahead and answer, if you can.

20       A.    I really can't say.  I mean, a

21  colostomy bag, that's something -- you know,

22  that person may have regular medical care and

23  may be more used to that sort of thing.  I

24  don't know.

25       Q.    Okay.  But we can agree, you and I,

1   that there is some set of people out there, for

2   whatever reason, that may have reluctance to

3   take off their clothing in front of other

4   strangers.  We can agree on that?

5        A.    Yes.

6        Q.    All right.  If multiple individuals

7   had --

8             MR. KEACH:  Just off the record.

9        (Discussion held off the record.)

10  BY MR. KEACH:

11       Q.    When you worked in the Cleveland

12  department of law, did you work in this office

13  proper?

14       A.    I was for several months.

15       Q.    Getting back to this issue with the

16  privacy.  Well, let me step back again.  Did

17  you have any involvement at all in defending

18  the city in civil litigation, when you worked

19  for the department of law?

20       A.    I did.  For five, six months, I was

21  in the public safety group here.

22       Q.    That's where Mr. Cortes is.  He's

23  in the public safety group as well.

24       A.    Very fortunate person, yes.  He's

25  very good.

1    Q.    I agree.  Mr. Cortes is a fine

2  attorney and it's a loss to the City of

3  Cleveland that he's working somewhere else

4  effective tomorrow at 5:00.

5        So when you worked in the public safety

6  group, this issue of delousing, did that ever

7  come up when you were working here as a lawyer?

8        A.    I was not involved, no.

9        Q.    Did the issue of doing clothing

10  exchanges with groups of detainees come up,

11  when you were working here as a lawyer?

12        A.    I don't have any recollection of

13  that, no.

14        Q.    Fair to say you never provided any

15  sort of legal opinions about either of those

16  issues?

17        A.    Yes.

18        Q.    Did you ever find any legal

19  opinions, just "yes" or "no", about strip

20  searches?

21        A.    No.

22        Q.    Can you tell me in general --

23  you're a lawyer, so you know well enough that

24  I'm not asking you to divulge any privilege.

25  Can you tell me what types of things you worked

1    on, when you were in the public safety group?

2            A.    It was for a brief time.  Mostly

3    practice research, things with responding to

4    appeals from inmates, cases with fire

5    inspections.  I also assisted other attorneys

6    with research that they may have had.

7            Q.    On what types of issues just in

8    general?

9            A.    In public safety, we kind of

10   touched on everything.  There was some criminal

11   appeal work as well as safety inspections.

12   Nothing really with the jails, no.

13           Q.    Okay.  Would you agree with me that

14   if a privacy partition could be placed into the

15   clothing room so that two individuals who were

16   disrobing could not see each other but the

17   corrections officer could continue to observe

18   them as they remove their clothing, that that

19   would accomplish the same goal as doing it with

20   them where they could see each other?

21               MR. CORTES:  Objection.

22           You can answer.

23           A.    Well, I'm not sure how feasible

24   that would be.  I mean, the important part is

25   for the corrections officer to ensure that they

Page 90

1    have removed everything, there's nothing

2    hidden.  You can't have someone hide a belt

3    around their thigh and later on use that belt

4    for something they shouldn't.  You can't let

5    someone who has two pairs of shorts hand in

6    one.  So it would have to be done just right.

7    I don't know how practical it would be out

8    there at the workhouse.

9          Q.    We'll address that in a moment.

10   Let's assume that a privacy partition can be

11   put into the clothing room --

12         A.    Okay.

13         Q.    -- and that even with that privacy

14   partition there, a corrections officer would

15   have a full view of both detainees as they

16   removed all of their clothing --

17               MR. CORTES:  Objection.

18         Go ahead.

19         Q.    -- but the detainees who were

20   removing their clothing and putting their

21   institutional uniform on could not see each

22   other because of the privacy partition --

23               MR. CORTES:  Same objection.

24         Q.    -- if that were the case, if the

25   corrections officer had a full view of both

Page 91

1   women or both men, depending on who is removing

2   their clothes, is there any reason why it would

3   be inappropriate to just allow these detainees

4   to be able to utilize a privacy partition?

5                   MR. CORTES:  Objection.

6           Go ahead.

7           A.    Given those assumptions, if those

8   things were in place like that, it could be as

9   effective.  Never done it like that.  Couldn't

10  tell you that it would, but given those

11  assumptions, it's a fair statement.

12          Q.    Now, do they have jail uniforms

13  down at the Justice Center?

14          A.    No.  We have uniforms for people

15  who had their clothing taken as evidence,

16  people who are a suicide risk or people who

17  have soiled clothing.  They're given jumpsuits.

18  But outside of that, no.

19                  MR. KEACH:  Off the record, please.

20          (Discussion held off the record.)

21  BY MR. KEACH:

22          Q.    Okay.  I'm going to show you a

23  document we're going to mark as Exhibit 21.

24                      -  -  -  -  -

25                  (Thereupon, Deposition Exhibit 21,

1           Photograph, was marked for purposes

2           of identification.)

3                - - - - -

4      Q.    I'm going to show you a photograph

5  I took yesterday, which we are going to mark as

6  Exhibit 21.  Before we do that, I'm just going

7  to show it to you and tell you that -- and we

8  can blow this up or not.  I'm going to give you

9  and Mr. Cortes an opportunity to inspect the

10  photograph before I do a couple things here.

11  But that is a photograph I took yesterday of

12  the clothing room.  Do you see the shelves off

13  to the left of the photograph with the clothes?

14      A.    Yes.

15      Q.    Is that what the clothing room

16  looked like, when you were there?

17      A.    To the best of my recollection --

18      Q.    Okay.

19      A.    -- not exactly, but, I mean, it was

20  a while ago.

21      Q.    Now, what I've shown you here, this

22  is looking down at the end of the wall and the

23  distance between the end of the shelf and the

24  wall over here is 8 feet, 4 inches.  Okay.

25  This distance right here.  I measured it

Page 93

1  yesterday.  So if we took -- and I'm going to

2  draw on this, assuming I can figure out how to

3  do that as well.  (Indicating.)

4        So I have a photograph here, okay, which

5  I imported into a program in my computer.  I'm

6  going to draw a line right down the middle of

7  that wall.  So I want you to imagine that

8  there's a wall that comes out like this.  Now,

9  that's not the best 3D imagery that one could

10  come up with, but I'm doing the best I can.

11  But there's a wall that comes out in the middle

12  between those two chairs and it comes out,

13  say, 3 feet.

14        So you're a corrections officer and

15  you're standing where this picture was taken

16  and you have two detainees where those chairs

17  are.  You would agree with me that you could

18  see each of those detainees just as well with

19  that wall in the middle as you could without

20  it, can't you?

21             MR. CORTES:  Objection.

22        Go ahead.

23        A.   If I were back far enough away from

24  the partition where I could, you know, have a

25  good view.  I'm not quite sure how far back the

Page 94

1  room comes this way.  I don't know.

2  (Indicating.)

3       Q.    The room is 14 feet long and --

4            MR. CORTES:   Bob, can you maybe

5  clarify for the record what you're reading

6  from?

7            MR. KEACH:    These are the

8  measurements I took yesterday, which I'm happy

9  to mark, if you want.

10           MR. CORTES:   Yeah.  Why don't we

11  just have them marked.

12           MR. KEACH:    All right.

13      Q.    Okay.  We'll mark these Exhibits 22

14  and 23.  Exhibit 22 are my handwritten notes

15  and measurements from yesterday which were

16  taken of the clothing room, and Exhibit 23 are

17  the measurements I took of the shower room,

18  which I'm going to provide to Mr. Cortes anyway

19  in a much better format than my god awful

20  effort to do it here.  Okay.  But regardless --

21  and you're free to look at these as well.

22  We'll have her mark them in just a moment.

23           MR. CORTES:  And I can make copies

24  of them when we're done.

25           MR. KEACH:    Okay.

```
                                           Page 95

 1                   -   -   -   -   -

 2               (Deposition Exhibits 22-23,

 3               Handwritten Notes of Elmer Robert

 4               Keach, were marked for purposes of

 5               identification.)

 6                   -   -   -   -   -

 7        Q.    But you would agree with me from

 8   that angle, if a corrections officer is

 9   standing here watching both detainees remove

10   their clothes, they could do it just as well

11   whether there's a privacy partition there or

12   not.  Fair to say?

13               MR. CORTES:  Continuing objection

14   to this line of questioning on this topic.

15        But go ahead and answer.

16        A.    Possibly, so.  It would depend on

17   exactly where the inmates are.  I mean, if

18   they're close to the partition, you could have

19   a bit of a blind spot, if you're not perfectly

20   aligned.  I mean, you could see them both, yes.

21   How about that?

22        Q.    Okay.  And we can agree, if we put

23   out a privacy partition 3 feet long, that the

24   detainees wouldn't be able to see each other

25   unless they were really trying to do so.  Fair
```

1   to say?

2        A.    And it went up to the ceiling, if

3   they came around, right.

4        Q.    Yeah.  If they tried to poke

5   around, look around --

6        A.    Sure, sure.

7        Q.    -- you know, that type of thing,

8   obviously they could, but if they're both

9   standing there not trying to actively look at

10  each other, they wouldn't be able to see with

11  the privacy partition there, would they?

12       A.    I would assume that's correct, yes.

13       Q.    You indicated to me you really

14  didn't know much about what was going on down

15  in that room during your brief tenure as the

16  jail manager.  Fair to say?

17       A.    You mean, the clothing exchange?

18       Q.    Yes.

19       A.    Well, I went there.  I saw it, but

20  I was never there when anyone was changing.  I

21  didn't feel that was appropriate.

22       Q.    And I'm not disagreeing with you.

23       A.    Yeah.  I knew of the room and I've

24  been there probably several times.  I wanted to

25  see everything and -- everything and every

1    place that was there.  But if someone is

2    changing, I'm not going to stand there.  I'm

3    not going to be there when they're doing

4    that --

5            Q.    And I --

6            A.    Yes, I knew.  I was aware of the

7    room.

8            Q.    I didn't mean to suggest --

9            A.    No.  I just want to be clear.

10   Right.

11           Q.    -- I'm not suggesting you would do

12   that.  Okay.  Did you ever consider putting a

13   privacy partition in that room?

14           A.    No.

15           Q.    Did you know at the time that you

16   went to see it that they were having multiple

17   people do this?

18           A.    I knew they were doing groups at a

19   time, but the room itself had room for one or

20   two people.  It mean, it's obvious you can't

21   put --

22           Q.    There's been testimony that there's

23   been upwards of three people in that room.

24           A.    By a group, I mean, you may have

25   people lined up outside the room --

```
                                        Page 98
 1        Q.     Okay.

 2        A.     -- I don't mean to imply that they

 3   would have a bunch of folks inside.

 4        Q.     Do you know; at any point in time,

 5   has anybody ever discussed putting a privacy

 6   partition in that room?

 7        A.     No.

 8               MR. KEACH:   Off the record.

 9         (Discussion held off the record.)

10   BY MR. KEACH:

11        Q.     Apart from what you've already

12   testified to today, can you give me any

13   justification for the policy and procedure of

14   conducting compulsory delousing on detainees at

15   the Cleveland workhouse?

16        A.     Excluding everything we discussed

17   earlier?

18        Q.     Yes.

19        A.     I don't have any additional

20   information.

21        Q.     And you can't tell me where that

22   policy came from, can you?

23        A.     I cannot tell you when it started

24   or who issued it.

25        Q.     You can't tell me whether or not a
```

Page 99

```
1    physician was ever involved in the decision to
2    implement that policy.  Fair to say?
3           A.    If what was involved?
4           Q.    A physician, a doctor.
5           A.    I don't know where it originated,
6    no.
7           Q.    But you can tell me at any point in
8    time if a physician was involved to try and
9    formulate that policy, can you?
10          A.    It may or may not.  I don't know --
11          Q.    I know.
12          A.    -- the answer is, no, no.
13          Q.    And you don't know whether or not
14   anybody that was an expert on, you know,
15   insects, lice, crabs, scabies was ever involved
16   in formulating that procedure, do you?
17          A.    I do not know.
18          Q.    Nobody ever gave you justification
19   for doing that.  Fair to say?  No one ever
20   said, "Hey, here's why we're doing this"?  Let
21   me do a better job of phrasing the question.
22   Did anybody ever come to you at any point in
23   time and give you an explanation as to why they
24   were doing the delousing procedure?
25          A.    Well, you know, when I arrived
```

Page 100

1    there and became aware of it, I asked the
2    supervisors and staff, "Well, what is this?
3    What is that?  The delousing, why are we doing
4    this?"  It's to prevent outbreaks.  It's to,
5    you know, stop any infestation.
6        Q.    And that's the extent of what you
7    were told, was to prevent outbreaks, stop
8    infestations?
9        A.    Yeah, that it was a standard
10   procedure --
11       Q.    Standard procedure?
12       A.    -- that had been there for many
13   years.  It was a health issue.  That's what I
14   was told.
15       Q.    Did anybody ever say to you if they
16   had to use the manner that they did, meaning
17   why the City of Cleveland had to use the manner
18   of delousing in terms of compulsory delousing
19   with using the pressurized spray can versus
20   allowing inmates to apply it to themselves?
21   Did anybody ever give you a description of,
22   Hey, here's why we got to spray them down like
23   this versus doing something different?
24       A.    I was never told why one was done
25   rather than the other.

Page 101

```
 1          Q.    Just you came into that position
 2    and that's how it was done and that's how it
 3    was always done --
 4          A.    Yes.
 5          Q.    -- for as long as people can
 6    remember?
 7          A.    As far as I know.
 8          Q.    Yesterday I took the testimony from
 9    Lieutenant Clark, who testified that this had
10    started back with her employment with the city
11    in 1992, when she worked at the workhouse as a
12    corrections officer.  So obviously it was going
13    on since at least the early 1990s.  Do you know
14    anywhere I can look now today to try to figure
15    out why they did this and why they did it in
16    the manner that they're doing it, in terms of
17    the delousing?
18          A.    I don't have any knowledge, no.  I
19    mean, it used to be under the department of
20    public health and then they were moved to the
21    department of public safety in 2007.  That's
22    all I know.
23          Q.    Can you give me any explanation as
24    to why detainees are not allowed to remove
25    their clothing and receive the jail uniform in
```

Page 102

1   private?

2        A.    My understanding is that that is

3   done to ensure that there's no contraband

4   removed or hidden.

5        Q.    Maybe I did a poor job of phrasing

6   that question.  Can you tell me why detainees

7   are not allowed to remove their clothing and

8   change into a jail uniform in private away from

9   other detainees, meaning I understand there

10  would be a corrections officer there observing

11  the detainee removing the clothing?  Why does

12  it have to be with multiple detainees at the

13  same time?

14       A.    I'm not aware of any specific

15  reason.

16       Q.    Just convenience?

17       A.    I imagine if they had brought one

18  or two people from court, that could occur.  If

19  they had a larger group, they would be kind of

20  lined up and waiting to change.  I never had

21  any complaints about it, but that's all I know

22  about it.

23       Q.    And I appreciate you bringing up

24  complaints.  You're not aware of any inmate

25  ever complaining about having to be deloused?

1    I know you were only there for four months, so

2    I'm talking about the scope of your knowledge

3    and then, you know, beforehand, if you know

4    anything about it, which you probably don't.

5         A.    No, no, I don't.

6         Q.    Did you ever hear about any inmates

7    complain about having to take off their

8    clothing in front of another detainee?

9         A.    No, no.  I never had to resolve

10   anything like that.

11        Q.    Do they have a grievance procedure

12   at the workhouse?

13        A.    They most certainly do.

14        Q.    And there would be multiple levels

15   to the grievance procedure, would there not?

16        A.    Correct.

17        Q.    The inmate would file the grievance

18   and then it would be given to a supervisor?

19        A.    Normally they would fill it out.

20   It would go to the corrections officer working

21   in that dormitory, sent to the supervisor.

22   They would try to resolve it there.  It could

23   be forwarded to social workers.  There's a

24   jailing commissioner.  It depends on the nature

25   of the problem.  Most things are resolved with

1   the supervisor.

2         Q.    I understand.  But let's assume --

3   you know, and I'm just going to give you one

4   example that I know from other litigation I've

5   done in the past about kosher meats.  There are

6   individuals that are of the -- I'm pretty sure,

7   like I'm almost positive that kosher has to do

8   with people who are practicing Orthodox Jews.

9   I don't know if there's a significant Orthodox

10  Jewish community here in Cleveland or not, but

11  let's assume you have someone come in and

12  they're an Orthodox Jew.  They can only eat

13  kosher meals, so they can't eat food that

14  obviously has pork in it.  They have to eat

15  meal that are appropriately prepared and I

16  think to some extent have some intervention by

17  a rabbi into its preparation.  They eat that

18  for religious reasons.  Have you ever had to

19  deal with a kosher food issue at any point in

20  time?

21        A.    I've had various food issues arise.

22  That doesn't spring to mind, but it would fall

23  into that sort of category, special meals .

24        Q.    All right.  So let's assume I go to

25  the supervisor and I say, "Hey, I'm not

1   getting" -- okay.  Special meals.  We'll just

2   use special meals, whatever it is.  You know,

3   vegetarians, Rastafarians.  There's like no end

4   to the type of special meals that people want

5   for religious reasons.  So someone wants

6   special meals for religious reasons.  They go

7   to their supervisor and say, "I'm not getting

8   my special meal."  The supervisor says, "Sorry.

9   I can't help you."  What's the next step that

10  they would take in the grievance process here

11  at the house of correction?

12       A.    Well, at that point that could be

13  referred to the jail manager who would see --

14  who has to evaluate what the situation was,

15  what the problems were, what could be done.

16  Ordinarily it wouldn't go to the commissioner.

17  It could depending on the nature of the

18  problem.  Meals usually aren't much of a

19  problem, because they have their own kitchen

20  there, so they can be very accommodating.

21       Q.    You mean, the facility has its own

22  kitchen or inmates have their own kitchen?

23       A.    No.  The facility has its own

24  kitchen, so they can try and work around

25  people's needs, I mean, within reason.

1      Q.     Now, let's assume I come to you and

2   I want my special meal and you say, "Sorry.  I

3   can't."  You're the jail manager.  You know, I

4   appeal it up to you and ask you and you say,

5   Sorry.  I can't help you," then what options do

6   they have? Do they have the ability to appeal

7   to the commissioner of public safety?

8      A.     That's open.  Of course people can

9   do that.

10      Q.     What is the -- all right.

11          MR. CORTES:   I think it's

12   commissioner of the division of corrections.

13          MR. KEACH:    Then director of

14   public safety.  My apologies.

15      Q.     Okay.  I'm going to try to step

16   back from this.  In New York state, if you're

17   in state prison, here's how the grievance

18   procedure works:  You file a grievance.  The

19   grievance is referred to a supervisor.  The

20   supervisor makes a decision on the grievance.

21   If you don't like the decision on the

22   grievance, it gets appealed to the deputy

23   superintendent for security.  If the deputy

24   superintendent of security doesn't resolve the

25   grievance to your liking, then you can appeal

1   to a statewide body called The Central Office

2   Review Committee.

3         So there's three levels to the grievance

4   process.  It's a formalized process in state

5   statute.  And that's the end.  Once you go to

6   The Central Office Review Committee, that's it.

7   Then you can either go to court or you can file

8   an article 78, you know, a writ of mandamus,

9   but that's the end of the road in the

10  department of corrections.

11        How did it work here in Cleveland?  What

12  are the formal steps of the grievance process?

13        A.    The first step would be at the

14  Cleveland House of Correction, the workhouse,

15  they would fill out a KITE, which would be a

16  complaint.  They could also write it on a piece

17  of paper if they wanted to.  I mean, if it's

18  not quite the proper form, no one is going to

19  throw it away.  It would go to the supervisor

20  who would see what the issue was, whether there

21  could be a resolution.  It usually ends there.

22  If the inmate is still upset or it's a bigger

23  issue, it can go to the jail manager.  If it's

24  something that's felt to be a legal issue, the

25  law department might be contacted.  If it's

1    felt to be a medical issue, the nurse might be

2    contacted.  The jail manager and the

3    commissioner have discretion to do that.  The

4    inmates of course can go outside of that

5    procedure, if they wish.  They can contact --

6    they can have their attorney contact the City

7    of Cleveland.  They can contact the courts, if

8    they wish to.  No one would stop them.

9         Q.    So why don't we get into the --

10        A.    It depends on --

11        Q.    The first step is go to a

12   supervisor and then they appeal to you and then

13   they appeal up to the commissioner for the

14   division of correction.  Is that how it would

15   work?

16        A.    It's more of a two to three step

17   process.  We have the supervisor and then we

18   have the jail manager, commissioner and then we

19   could have an outside interested party, such as

20   a judge depending on the nature of the

21   complaint.

22        Q.    Okay.  I appreciate that.  Do you

23   know, if it gets to your level either going to

24   the jail manager or the commissioner, is any

25   computerized record generated that would

Page 109

1   reflect the grievance and then how it was

2   disposed of?

3       A.    Ordinarily not.

4       Q.    That would just be handwritten?

5       A.    Ordinarily.

6       Q.    Did you have any involvement in

7   training corrections officers at the house of

8   correction?

9       A.    I've done some training in the

10  past, not on a regular basis.

11      Q.    Did you do any training about ID

12  procedures?

13      A.    No.

14      Q.    And the only time you ever worked

15  in the house of correction was the roughly four

16  months you served as the jail administrator,

17  plus any time you would be filling in to cover

18  for someone else?

19      A.    Roughly.  I mean, that's --

20      Q.    I'm not holding you to that --

21      A.    Yeah.

22      Q.    -- I'm not going to be subpoenaing

23  your time records.

24      A.    It wasn't years.  It wasn't days.

25  It was --

1          Q.    It was a few months?

2          A.    -- it was a couple of months,

3    somewhere in there.

4          Q.    But you never worked in there in

5    any other capacity besides that?

6          A.    No.  Only as a -- right.

7          Q.    Okay.  Only as a supervisor, only

8    as a jail manager or subbing for somebody who

9    needed coverage because they were on vacation

10   or sick or whatever?

11         A.    The whole time working there civil

12   service wise, I was a supervisor.  That was my

13   title.  Never a corrections officer or

14   counselor or anything like that.

15              MR. KEACH:  Off the record.

16         (Discussion held off the record.)

17   BY MR. KEACH:

18         Q.    Have you told me everything you

19   know about delousing at the Cleveland workhouse

20   in your testimony today?

21         A.    I can't think of anything involving

22   that that wasn't covered.

23         Q.    Have you told me everything you

24   know about clothing exchanges at the workhouse

25   in your testimony today?

1    A.    I can't think of anything to add.

2    Q.    Have you told me everything you

3  know about clothing exchanges being done in

4  groups at the workhouse in your testimony

5  today?

6    A.    Yeah.  It wasn't much.  That's all

7  I know.

8    Q.    When did you graduate from high

9  school?

10    A.    I graduated in 1998.

11    Q.    Okay.  1998 or 1988?

12    A.    1988, yeah.  I wish.  That was

13  wishful thinking.  1988.

14    Q.    Yeah, I thought you and I were the

15  same vintage, but I wasn't sure.  And you went

16  right from high school to John Carroll?

17    A.    Yes.

18    Q.    Did you go from John Carroll

19  directly to Denver to earn your master's degree

20  or did you do something in the interim?

21    A.    No.  I went directly to Denver.

22    Q.    Then you came back from Denver.

23  What year did you graduate from Denver?  1993,

24  1994?

25    A.    Denver was 1994.

Page 112

1        Q.    Is that when you started working at

2    the police department?

3        A.    Yes.  It was June '94 and then the

4    police department was November of '94.  I

5    briefly worked as a salesperson at a

6    manufacturing firm for a couple of months

7    before that.

8        Q.    Do you live in Cleveland?

9        A.    I do.

10       Q.    Like within the city limits?

11       A.    I do.

12       Q.    In your employment at the

13   department of corrections, have you ever faced

14   any disciplinary action?

15            MR. CORTES:  Objection.

16       But go ahead and answer.

17       A.    I think I had some verbal warnings,

18   a few in the past.  It's been a while.  I'd

19   have to get my record out for that.

20            MR. KEACH:  Off the record, please.

21        (Discussion held off the record.)

22   BY MR. KEACH:

23       Q.    Okay.  We conferred at length off

24   record and you indicated roughly within the

25   past year or two, you had received a verbal

```
                                           Page 113
 1   warning for a negative interaction you had with
 2   an inmate, correct?
 3         A.    Correct.
 4         Q.    Anything beyond that you can think
 5   of?
 6         A.    Nothing that I can recall.
 7         Q.    I already know the answer to this,
 8   but have you ever been charged with a crime?
 9         A.    No.
10               MR. KEACH:    I don't have anything
11   further for you, unless Mr. Cortes has follow
12   up.
13               MR. CORTES:   No questions.
14               MR. KEACH:    Do you want him to
15   read and sign?
16               MR. CORTES:   Yes.
17               MR. KEACH:    Let the record
18   reflect the lieutenant will read and sign his
19   transcript.  That concludes his examination
20   with my thanks for his courtesies.
21               (Thereupon, the deposition
22          was adjourned at 12:55 p.m.)
23
24
25
```

Page 114

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                      SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 115

1                REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                                    SS:

4    County of Cuyahoga.   )

5

6            I, Tracy Morse, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, JOSEPH STOTTNER,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19            I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 116

1            I do further certify that I am not

2     a relative, counsel or attorney for either

3     party, or otherwise interested in the event of

4     this action.

5            IN WITNESS WHEREOF, I have hereunto

6     set my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 25th day of September,

8     2015.

9

10

11

12

13            _____

14            Tracy Morse, Notary Public

15            within and for the State of Ohio

16

17    My commission expires 1/26/2018.

18

19

20

21

22

23

24

25