| | | |
|---|---|---|
| TYNISA WILLIAMS and | ) | |
| SHAWN BEALER, both individually and | ) | |
| On behalf of a class of others similarly | ) | |
| Situated, | ) | CASE NO. 1:09-CV-2991 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | HON. BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| THE CITY OF CLEVELAND, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CITY OF CLEVELAND'S RESPONSE TO PLAINTIFF WILLIAMS' MOTION FOR SUMMARY JUDGMENT AND FOR A PERMANENT INUNCTION AND CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Tynisa Williams, is the purported representative for the class of female inmates incarcerated at the Cleveland House of Corrections, also known as the Workhouse, between December 26, 2007[1] and April 14, 2010. Plaintiff filed her Second Amended Complaint on January 5, 2015 (ECF 90) and alleged that the Plaintiffs[2] were "subjected to being deloused in violation of their rights under the Fourth Amendment of the United States Constitution, and the right to privacy, which is protected by the Fourth Amendment." There are a few well-settled issues involved in this law suit. Under *Florence v. Bd. Of Chosen Freeholders of the County of Burlington*, 132 S.Ct. 1510 (2012) there is no longer any questions that individualized suspicion is unnecessary to conduct blanket strip searches and to delouse prisoners at intake, however; the method of the strip search and the delousing are still subject to constitutional evaluation. Therefore, the issues presented here are as follows:

---

[1] This is the date alleged in the Second Amended Complaint, and is two years before the filing of the original complaint, ECF 90, page 747.

[2] There are two Plaintiffs in this matter that purport to be class representatives. Shawn Bealer did not move for summary judgment and is the subject of a pending motion to dismiss that would remove him as a class representative but would leave him as a member of the putative class.

(1) May the City of Cleveland strip search pretrial detainees in groups of three?

(2) May the City of Cleveland apply delousing solution to the naked body of a pretrial detainee through a pressurized spray?

(3) Does the involuntary application of a delousing agent violate the Fourteenth Amendment to the United States Constitution for the imposition of unnecessary medical treatment?

**I.      Plaintiff does not Plead a Class for Group Strip Searches**

Plaintiff has not plead a constitutional violation for the performance of group strip searches in her Second Amended Complaint as a portion of her proposed class.  In Paragraph 7 of Plaintiff's Second Amended Complaint, (ECF 90, pg 747) Plaintiff defines the class as:

> All persons who have been or will be placed into the custody of the City of Cleveland House of Correction, after being charged with misdemeanors, summary violations, violations of probation, traffic infractions, civil commitments or other minor crimes, including failure to pay fines, and were deloused upon their entry into the City of Cleveland House of Correction, pursuant to the policy, custom and practice of the City of Cleveland.  The class period commences on December 26, 2007 and extends to the date on which the City of Cleveland is enjoined from or otherwise ceases, enforcing its policy, practice and custom of conducting delousing absent reasonable suspicion that an individual is harboring lice. Specifically excluded from the class are Defendant and any and all of its respective affiliates, legal representatives, heirs, successors, employees or assignees.

The Second Amended Complaint is internally inconsistent because the Class is only defined as including delousing, however Paragraph 54 of Plaintiff's Second Amended Complaint states that the Plaintiffs' rights were "violated because their strip searches *and* delousing occurred in the presence of other detainees."  (Emphasis added.)  The defined class does not include the strip

search allegations and therefore the Second Amended Complaint is inconsistent. Since the Plaintiff does not include those individuals who were strip searched as a part of the class, but yet she filed a complaint based upon that conduct the Plaintiff is alleging claims that are not typical of the class, and are therefore in violation of Fed.Civ.R. 23. *Senter v .General Motors Corp.* 532 F.2d 511, 524 (6th Cir. 1976). Plaintiff cannot bring claims that are inconsistent with the class and since the class is limited to delousing this Court should not consider Plaintiff's individualized strip search allegations. Regardless of Plaintiffs' failure to include strip search violations in their class definition, the alleged violations will be addressed in this response and motion.

Plaintiff's Second Amended Complaint brings four causes of action. The first claim is for unreasonable search and seizure under the fourth amendment related to strip searches and the "compulsory delousing of individuals arrested for misdemeanors or violations absent some particularized suspicion that the individual in question has either contraband or weapons." (ECF 90, page 757). The Second Cause of Action is brought pursuant to the fourth and fourteenth amendments to the United States Constitution and is for the alleged imposition of unnecessary medical treatment in reference to the compulsory delousing procedure. The Sixth Circuit noted in a footnote to its opinion in this matter that:

> Plaintiffs appear to have abandoned any argument with respect to the second cause of action noted in their proposed second amended complaint, which alleges that the jail's delousing procedure is unconstitutional because it does not actually prevent lice. *Cf. Florence*, 132 S.Ct. at 1518 (noting that undoubted interest in eradicating lice and approving use of delousing solution); *Russell*, 384 F.3d at 448 (upholding an institution's use of delousing solution despite evidence that it was only imperfectly useful at killing lice because "the fit between the jail's legitimate interests and its policy need not be perfect in order to survive scrutiny, it need only be rational"). *Williams*, et al. v. *City of Cleveland*, 771 F.3d 945 (6th Cir. 2014).

Plaintiffs' third and fourth causes of action are for declaratory judgment and a permanent injunction based on the facts included in counts one and two of the complaint..

## II.        Plaintiff Shawn Bealer is not a Movant to Plaintiff Williams' Motion for Summary Judgment

Defendant moves to incorporate its Motion to Dismiss Shawn Bealer or Alternatively Bar his Future Testimony, filed November 6, 2015 (ECF 104) and respectfully requests that this Court deny all claims and factual assertions purported to be brought on behalf of the class by Plaintiff Shawn Bealer.  Without having received his testimony, despite an attempt to take his deposition (Shawn Bealer Deposition (Sep. 14, 2015), Defendant will not be able to adequately prepare to defend against the class he allegedly represents.

Plaintiff Bealer's claim is unique from Plaintiff Williams' claims because Plaintiff Bealer alleges that a trustee (a fellow inmate) deloused him and directed him to shower.  There is no other indication in the record that trustees were ever involved in the inmate intake procedure and certainly not with delousing or showering the new inmates.  Rufus Williams Deposition (Sep. 9, 2015) 25:1, Reginald Flowers Deposition (Sep. 8, 2015), 34:22 – 35:1.  As Plaintiff Bealer is missing and has not been participating in this action, including not participating in his deposition, Defendant presumes that Plaintiff Bealer will be unable to raise a material question of fact to show that trustees have been involved in delousing and showering new inmates.  As such, Defendant respectfully requests that Plaintiff Bealer's claim regarding trustee involvement be dismissed from this action unless the Plaintiff can raise a material issue of fact.

### III.     Statement of Facts

Plaintiff Tynisa Williams was arrested on non-felony charges of driving with a suspended license and was admitted to the House of Corrections for the first time on October 30, 2009.[3] Tynisa Williams Deposition (Sep. 14, 2015) 15:15. The House of Corrections, also known as the workhouse, is a jail facility administered by Defendant City of Cleveland.  Upon arrival to the Workhouse, Plaintiff Williams was placed in a holding cell with about ten other women.  T. Williams Depo. at 29:23.  The men that were transferred from the other facility were temporarily housed in a separate holding cell.  T. Williams Depo. at 29:19-25.  Once Plaintiff Williams completed the intake paperwork she testified that she was taken into the clothing exchange area (Id. at 31:2-3) with two other women and one correctional officer (Id. at 33:16 – 34:7), was told to shower (Id. at 38:2-3) and was then sprayed with a delousing agent which misted her body along her front, and then was asked to squat and was again sprayed with delousing agent on her anus.  Id. 41:5-7.  Plaintiff Williams testified that some of the liquid penetrated her anus but made clear that she could only feel the mist because it was liquid and cold.  Id. at 44:19-20; 64:21-23.  The women were deloused one at a time, but while they were all together in the clothing exchange area.  Id. at 44:2-4.

The City of Cleveland stopped delousing prisoners as of April 14, 2010.  (Plaintiff's Exhibit 6).  At this moment there is no blanket procedure for delousing inmates.  (David Carroll Deposition (Sept. 8, 2015) at 61:6-11). The City continues to strip search incoming prisoners in groups.

---

[3] Plaintiffs' Second Amended Complaint states that she was arrested for driving with a suspended license (ECF 90 at 754), however in her deposition, Plaintiff Williams stated that she was incarcerated for a parking ticket in Rocky River.  Later in her testimony she states that she was pulled over by the Cleveland Police for illegal parking, and that she was driving under suspension.  T. Williams at 24:12-15.  The distinction is not noteworthy as both are non-felony adjudications.

There are material issues of fact in this suit, but Defendant asserts that this Motion can be determined based on Plaintiff's telling of her experience at the House of Corrections. However, testimony from Defendant's witnesses demonstrate that if the search and delousing process happened as Plaintiff has told, then it was against current practice and policy and the City of Cleveland should not be held liable. Primarily, the City alleges that the inmates were told to face separate walls while they undressed to limit the possibility of seeing one another disrobe (R. Williams Depo. at 30:5-6); there were towels available to the inmates to cover themselves after they disrobed (Stella Clark Deposition (Sept. 9, 2015) at 74:19-20; R. Williams Depo. at 30:5-6); that the inmate was searched and deloused individually in the shower area (Clark Depo. at 43:9-10; 72:4-11; R. Williams Depo. at 30:8-11, see also 33:8 – 34:2; Joseph Stottner Deposition (September 10, 2015) at 25:9-21); that the tip of the applicator of the delousing spray bottle was at least one and a half feet from an inmate's body (R. Williams Depo. at 42:14-43:10; Clark Depo. at 60:17-61:3); that inmates were not asked to squat during the strip search without probable cause (R. Williams Depo. at 91:1-3, 92: 2-8) and that the inmates were instructed to shower after the delousing agent was applied (Clark Depo. at 39:13-18; Stottner Depo. at 34:13-15). While Defendant does not dispute that this method of delousing was nicknamed the "hose method," Defendant does dispute Plaintiff's characterization of how it occurred in her complaint, but generally agree with her deposition testimony with the exception of the above questions of fact.

IV.     **The Sixth Circuit's Decision is not Determinative of these Motions.**

When the Sixth Circuit ruled on Defendant's Motion for Judgment on the Pleadings, it did so without a fully-developed record. This Court can only apply the Sixth Circuit's interpretation of case law to the details that are now before the Court on this record. The Sixth

Circuit interpreted the conditions at the Cleveland House of Corrections based solely on the Plaintiffs' description in the complaint. The Sixth Circuit's description of the "hose method" (delousing) and the strip search, which does not wholly match the Plaintiff's description in deposition, served only to demonstrate to this Court that there was a plausible constitutional violation – not that there was a certain violation as the Plaintiff attempts to convince this Court.

The Sixth Circuit stated that the delousing agent ("a stream of liquid") can act as a form of touching during a strip search, thereby making the search more humiliating than a search in which there is no touching. *Williams*, et al. v. *City of Cleveland*, 771 F.3d 945, 952 (6th Cir. 2014). However; the Sixth Circuit also compared the alleged touching in this case to the touching in *Evans v. Stephens*, where a baton was used to search plaintiff's anus and genitals. 407 F.3d 1272, 1281 (11th Cir. 2005). The alleged touching in this case is entirely different. Paragraph 12 of Plaintiff's Second Amended Complaint states that '[t]he City employs the "hose treatment," where detainees are forcibly sprayed with delousing solution from the hose or an exterminator can.' See also, Paragraph 25, of Plaintiff's Second Amended Complaint. However; Plaintiff testified in deposition that the delousing was a light spray, like a body mist that only lasted a few seconds. T. Williams Depo. at 64:14-23; 43:16. Plaintiff would like to draw in this Court's mind's eye the image of her being hosed down like an animal when in reality this method of delousing was no more offensive than applying perfume, bug spray or even a spray tan – common activities for young women everywhere. For the Sixth Circuit to characterize this action as a search-by-touch by a corrections officer and liken it to a case where a baton was used to touch a prisoner is irrational and incredible.

Furthermore, to state that this "body mist" penetrated the Plaintiff's anus would be overstating if not simply lying about what occurred during the delousing process at the House of

Corrections. Taking Plaintiff Williams' story as told, it is clear that Plaintiff Williams was asked to disrobe, shower, was misted with delousing agent, asked to squat, and was then misted again with delousing agent down her backside. Plaintiff Williams does not state that she was asked to spread the lobes of her buttocks in her deposition, and therefore to say that anything truly penetrated her body, would be a stretch of the imagination. When the Sixth Circuit reviewed this case, it was forced to take Plaintiff's version of the story - she was asked to "spread the lobes of her buttocks," which certainly paints a much more humiliating picture than merely squatting. This was not the "forceful spray" that Plaintiff initially described in her complaint which may have conceivably resulted in penetration if aimed directly at the inmate's rectum; this was a light mist. Hardly an offensive or forceful spray that would penetrate one's anus in any way more offensive than spray from the shower.

The Sixth Circuit, in making their decision that the differences between the case herein and *Florence v. Bd. Of Chosen Freeholders of the County of Burlington* were relevant and therefore could plausibly create a constitutional violation, did not take into consideration that the Plaintiff felt as though the delousing spray was just a mist (supra), that she was not asked to spread her buttocks during the visual cavity search (T. Williams Depo, pg 44:2-3), and the only discomfort she describes in her deposition is a vaginal infection she treated two days after her release, which she was prone to receive, and which has not been medically related to the delousing agent (*Id.* at 57:20 – 59:4). To quote the Sixth Circuit opinion in this case: "Plaintiffs' circumstances are far removed from those at issue in *Florence*, given that "[p]ublic exposure of the genitalia accompanied by physical touching is far more intrusive than directing an arrestee to remove her clothing in private for purpose of visually inspecting the arrestee's genitalia." *Williams*, *et al.* v. *City of Cleveland*, 771 F.3d 945, 953 (6th Cir. 2014), citing to *Amaechi v.*

*West*, 237 F.3d 356, 363 (4th Cir. 2001). However, as previously demonstrated this is not the type of touching that the Supreme Court of United States likened to a constitutional violation. See *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560 (6th Cir. 2013). The inmate in *Stoudemire* was an amputee with special medical concerns, who was instructed to disrobe for an impromptu and allegedly baseless search. *Id*. The strip search in *Stoudemire* was conducted in a cell with a window that looked out onto a high-travel corridor and therefore any one could look in on the search at any time. *Id*. at 567.

Contrary to *Stoudemire*, the search in this case took place in a private clothing area, albeit the search was completed in the presence of two other inmates. However, an important difference from *Stoudemire* is that those inmates were in the exact same position physically, and emotionally, as the Plaintiff. These inmates were standing side-by-side during the search (T. Williams Depo. at 39:13-41:7; 42:23-25) but squatted one-by-one while still in line so that the inmates were not able to see each other's genitalia without taking effort to move out of the position in which they were placed by the corrections officer, effort that the Plaintiff does not recall having been taken by any other inmate during her search. T. Williams Depo. at 61:13-16. This is drastically different than passers-by viewing a strip search of an amputee without her prosthetics.

## V.     Standard of Review

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; see also, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under

the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party may move for summary judgment on the basis that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law. In response to a summary judgment motion properly supported by evidence, the nonmoving party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989); *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

The court is not duty bound to search the entire record in an effort to establish a lack of genuinely disputed material facts. *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied sub nom. *Superior Roll Forming Co. v. Interroyal Corp.*, 494 U.S. 1091 (1990). Rather, the burden is on the nonmoving party "to present affirmative evidence to defeat a properly supported motion for summary judgment," *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-405.

VI.     *Florence* **and the Legal Standard for Constitutional Violations.**

Plaintiffs' claims against the City of Cleveland must fail for the simple reason that there is no underlying, clearly-established, constitutional violation. Penological intake delousing procedures by custodial facilities of those admitted into the general population do not violate any clearly established federal constitutional rights owed to the Plaintiffs. In fact, the United States Supreme Court recently found in *Florence v. Bd. Of Chosen Freeholders of the County of*

*Burlington*, that strip searching and delousing inmates without individualized suspicion was not a violation of an inmate's constitutional rights. 132 S.Ct. 1510 (2012).

In *City of Los Angeles v. Heller*, the United States Supreme Court held that a municipal entity cannot be liable of a § 1983 cause of action where there was no underlying constitutional violation. 475 U.S. 796, 799 (1986) (Per curiam). Plaintiff bears the burden of proving that the City caused a constitutional violation under the seminal case *Monell v. Dept. of Social Services City of New York*, 436 U.S. 658, 98 S.Ct. 201 (1978). A municipality cannot be held liable for unconstitutional actions of its employees under a theory of *respondeat superior*. No City employee has committed a constitutional violation under the City's policies, therefore the City cannot be held liable. As previously stated, it is axiomatic that when there is no clearly established constitutional violation, it must then ask whether the right was clearly established. *Monell*, 436 U.S. at 691. The Court must make this inquiry within the specific context of the case and "not as a broad general proposition." *Brousseau v. Haugen*, 125 S.Ct. 596 (2004), 543 U.S. 194 (2004).

The *Florence* Court adopted the standard previously set out in *Bell v. Wollfish* (441 U.S. 520, 559 (1979)) and *Turner v. Safley* (482 U.S. 78 (1987)) to determine the validity of the intake procedures at issue in that case, and as this court must do for the similar procedures in this case. The *Florence* Court concluded that determining the reasonableness of a search requires a "balancing of the need for the particular search against the invasion of personal rights that the search entails." Citing to *Bell*, supra. The test requires that the court consider: (1) the scope of the intrusion, (2) the manner in which the search is conducted, (3) the justification for initiating the search, and (4) the place where the search is conducted. In using this test, the *Florence* Court cautions jurists to consider the difficulties of operating a detention center, and mandates

deference be given to the administrators of those facilities and the decisions they make. *Florence*, 132 S.Ct. at 1516. Of overarching importance, the *Florence* Court re-affirmed "the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests. *Id.* at 1515. The Court added that in deciding whether a regulation is reasonably related to a legitimate penological interest "is peculiarly within the province and professional expertise of corrections officials." *Id.* at 1517.

The Supreme Court went further in stating that "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Florence*, 132 S.Ct. at 1518. The Supreme Court recognized the necessity for the invasive intake procedures at issue overriding the privacy interests at stake even absent reasonable suspicion: "[c]orrectional officers have a significant interest in conducting a thorough search as a standard part of the intake process. The admission of inmates creates numerous risks for facility staff, for existing detainee population, and for a new detainee himself or herself." *Id.* The Sixth Circuit has interpreted *Florence* to stand, at most, "for the proposition that every inmate who will be admitted to the general jail population may be (1) subjected to a visual strip search for contraband and (2) required to self-apply delousing agent even without individualized suspicion that she is concealing contraband or harboring lice. *Williams*, 771 F.3d 945, 952. Therefore, the question remains whether or not the manner in which the City of Cleveland conducted the search and the delousing were clearly established constitutional violations.

To quote the Sixth Circuit in the opinion remanding this case to this Court: The touchstone of whether a given search or seizure is reasonable is whether the jail's need for the particular search outweighs the invasion of personal rights that the search entails. To this end, courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. If a correctional institution possesses no readily available alternative other than to engage in the particular conduct at issue, its conduct likely is reasonably related to its legitimate penological interest. But where a particular search or seizure involves significant intrusion into a detainee's privacy interests, the existence of obvious, easy alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests suggests that the institution's need to proceed in its chosen manner does not outweigh the burdens it imposes upon the detainee and is therefore unreasonable. *Williams*, 771 F.3d 950.

Plaintiff has suggested that the Defendant has alternatives to group strip searching including erecting partitions in the clothing exchange room or changing in the shower stalls. As an alternative to spraying delousing solution on the inmates, the Plaintiff has suggested using a lice shampoo like that which was used in *Florence*. These proposed alternatives will be analyzed in the remainder of this Motion.

**VII.    There was no violation of Clearly Established Constitutional Right.**

Even assuming that a violation of a constitutional right could be established in this case the right would not be considered clearly established to a reasonable public official at the time. At that time, and currently, there is no Sixth Circuit decision that has considered the issue of group strip searches or delousing in a manner similar to the circumstances described by the Plaintiff, moreover the Supreme Court of the United States has held that strip searches and

delousing without individual suspicion, though limited to the fact of that case, were not constitutional violations. *Florence,* 132 S.Ct. 1510. That decision held that custodial entities have a significant interest in the penological objective of keeping their facilities free of lice. Therefore, it is not clearly established that the manner in which this Defendant accomplished this objective offends the Constitution.

**VIII.   Group Strip Searches are Reasonably Related to Penological Interests.**

Detainees who are strip searched with two other detainees, as Plaintiff Williams alleges, have not had their constitutional rights violated. In this case, Plaintiff Williams has alleged that she was asked to disrobe in the presence of a correctional officer and two other detainees, told to shower in separate stalls and then was asked to stand in a line with the other two detainees and one by one spread their arms and legs and to squat while being deloused.

*a.    Scope of the intrusion.* There is no question that "a strip search is a particularly extreme invasion of a detainee's Fourth Amendment rights" and therefore strip searches must be performed in a manner that advances reasonable penological interests.

*b.    Manner in which the search is conducted.* The strip search in this case was conducted outside of the view of non-corrections personnel in an area utilized solely for clothing exchanges, delousing, and showering. The room is made of solid walls, without windows and with one entrance. The search is conducted simultaneously with like-positioned detainees. The manner of this search is highly distinguishable from that in *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560 (6th Cir. 2013). In *Stoudemire* a disabled inmate was subject to a random and seemingly needless strip search. The search took place in her cell which contained a window that looked on to a particularly busy hallway. The correctional officer in *Stoudemire* did not take any effort to cover the window to protect the inmate's privacy. The plaintiff in

*Stoudemire* was forced into a situation where anyone walking by could have seen her naked form for an unnecessary and harassing search. Plaintiff Williams was only subjected to the view of two other detainees who were in the same emotional and physical situation during their initial processing into the facility. While it may be embarrassing it is certainly not the same caliber of humiliation as that which this Circuit has found to be unconstitutional under *Stoudemire*.

        *c.*      *Justification for the search*. Inmates are searched in groups when there is a high volume of inmates to be processed into the jail. Carroll Depo. at 36:20-37:9; R. Williams Depo. at 23:22 – 24:2. Inmates arrive at the Workhouse in large groups and are transported by van. The Plaintiff arrived with approximately ten other females as well as some males. T. Williams Depo. at 29:23. Unlike at some other facilities, these inmates arrive for processing all at once instead of throughout the day and night and this creates an immediate need to separate and search the large group of people as expediently as possible. When the inmates first arrive they are in a holding cell before processing. R. Williams Depo. at 18:17-19:7. By processing up to three inmates at a time, the Defendant reduces the time that each inmate is held in the holding cell which thereby reduces the risk of contraband spreading to the other inmates. Furthermore, the identification unit where the inmates are processed is not staffed at all times, therefore it is important to be sure that all the inmates are processed during the course of the full work day. R. Williams Depo. at 62:16-18.

        *d.*      *Place of Search.* This search occurs in a small room, away from the eyes of detainees that are not also being searched. In fact, this will be the last time that the inmate is afforded even the modicum of privacy as they will be transferred to a dormitory pod with several bunk beds with no privacy partitions, a shower with no privacy partitions and bathroom stalls with only quarter walls. Acting Commissioner of the Department of Corrections has testified

that during clothing exchanges in the dormitory there is even less privacy due to the greater number of individuals in the room. Carroll Depo. at 38:9-39:24.Plaintiff Williams testified that in subsequent stays at the House of Corrections she routinely used the bathroom facilities and changed in front of other inmates and that the reason she was embarrassed on October 30, 2009 was because it was her first time in jail. T. Williams Depo. at 68:22 – 69:13. This is not an example of the shocking strip search demonstrated in *Stoudemire* where the inmate was clearly being harassed. This was a strip search that occurred in a private room, with a limited audience, and for a stated, obvious and constitutional purpose.

       *e.*    *Alternatives to Group Searches*.    Plaintiff suggests that the Defendant install partitions in the clothing exchange area, that the Defendant allows the inmates to change in the shower stalls, or that the Defendant simply search the inmates one-by-one. As addressed above, there is a reasonable penological objective to searching the inmates in small groups of the same gender. While it would be possible to install a partition in the clothing exchange area, that partition could cut down on visibility for the corrections officer and lead to a security breach. Stottner Depo. at 89:13 – 90:8. As just one example, if the correctional officer needed to approach an inmate that was on one side of a partition, the inmate on the other side of the partition could retrieve contraband or fashion a weapon out of items in the room while the correctional officer worked with the other inmate. The Supreme Court of the United States has affirmed that jailers should be given discretion in creating their policies. Only members of the House of Corrections staff are aware of any staffing shortages or concerns within the Department of Corrections. While it may seem like a simple solution to add staff to the clothing exchange process thereby eliminating any security concerns, such a solution may not be available on any given day.

Plaintiff also suggested that the inmates change in the shower stalls, however, as pointed out by correction officer Rufus Williams, the shower stalls will be wet because all inmates admitted into the House of Correction are required to shower and since all inmates are admitted at the same time, only the first few inmates processed will have the advantage of having a dry place to change out of their street clothes and into their jail uniform. Their clothing would inevitably get wet and then would be placed in a lockbox for the remainder of their stay resulting in a mold and mildew environment. R. Williams Depo. at 68:1-2. In summation, while the alternatives at first appear simple, in reality these alternatives would either pose a security risk or a hygiene risk to the inmates and therefore are not so *de minimis* as to make a group strip search a constitutional violation.

### IX.    Delousing by the "Hose Method" is Reasonably Related to Penological Interests.

Plaintiff testified that she was sprayed through a nozzle attached to a pressurized can from approximately six inches away from her body. T. Williams Depo. at 42:6-7. Plaintiff testified that the spray felt like a body mist. Id. at 44:17-18. She also testified that the only reason she felt it touch her body was because it was a cold liquid. Id. at 64:21-23. Plaintiff testified that she was not allowed to shower after the application of the delousing agent. Id. at 52:15-19. Despite being released shortly after processing was completed, Plaintiff Williams did not immediately go home to shower; instead she took her son trick-or-treating, put her son to bed, and showered as she normally did before bed. Id. at 56:6-23. The only irritation that the Plaintiff testified having was a vaginal infection that she treated at Metro and has no proof was related to the delousing agent. Id. at 44:21 – 46:7. Plaintiff has not submitted any documentation linking the delousing agent to her infection. The Plaintiff suffers from these infections with some frequency. Id. at 57:20-58:12.

*a.* *Scope of the intrusion.* Plaintiff's counsel would like to characterize the delousing process in such a way that it evokes an image of the 1960's civil rights movement, however in reality, Plaintiff Williams experienced a body mist – she did not even characterize it as a spray. The Sixth Circuit stated previously that any search becomes much more invasive when it is completed by touch and held that touching may include the stream from the applicator. Defendant asks this Court to consider the full record before it and find that a "body mist" is not the type of offensive touching that courts have been concerned with in the past. Putting aside the fact that the Plaintiff was naked, this mist could not have been any more offensive than feeling the mist of perfume or bug spray.

Plaintiff also alleges that the delousing agent penetrated her anus. While there is little doubt that the delousing liquid ran down her buttocks and likely over her anus, it is very hard to believe that the agent managed to actually penetrate her body. Furthermore, Plaintiff testified as follows:

> Q: You said that the delousing solution was like a body mist. Was
> it a light mist like that?
> A: Yes.
> Q: So it didn't hit you with any kind of force?
> A: No.
> Q: Okay. Did you feel it hitting you?
> A: Yes.
> Q: Did you feel it just because it was a liquid and cold.
> A: Liquid and it was cold. T. Williams Depo at 64:14-23

*b.* *Manner in which the delousing was conducted.* In this instance, the manner in which the delousing was conducted and the description of the scope of the invasion are very similar and require very little differentiation. The delousing agent was applied by a nozzled hose on a pressurized canister that resembled an exterminator's can. R. Williams Depo at 41-43. Plaintiff testifies that although the nozzle never touched her skin, the guard applied the solution

from approximately six inches away. The delousing process took only a few seconds. T. Williams Depo. at 43:14-16. The spray was not directed at the Plaintiff's face. R. Williams Depo. at 35:7.

c. *Justification for delousing.* There is no question after the decision in *Florence* that there is plenty of justification to delouse inmates as part of a blanket policy. The delousing solution was applied in this manner because it is the experience of the officials at the House of Corrections that inmates only follow orders fifty percent of the time and spraying a delousing agent will likely be more effective and will result in fewer altercations with inmates than allowing the inmate to apply a delousing solution themselves. Carroll Depo. at 31:12-18. If the corrections staff could not be sure that a delousing solution was at least applied and not poured down the shower drain, as could be the case with a delousing shampoo given to inmates, then there would be a limited purpose in delousing inmates at all. It just takes one noncompliant, infected, detainee to create an infestation within the jail population.

d. *Place where delousing occurred.* Delousing occurred in a semi-private room, just as the strip searches described above and in the case of Plaintiff Williams, were conducted simultaneously. Plaintiff was shielded from detainees that were not being deloused at that time and were subject to the eyes of only the corrections officer. The other detainees in the room with her were standing directly next to her.

e. *Alternatives to the Hose Method for delousing.* Plaintiff suggests two alternatives (1) that the Defendant delouse through a self-application method such as a shampoo or (2) Defendant continue as they are now and only treat inmates for lice if there is a suspicion that the inmate is infected.

Self-Application has unknown results. The corrections officer cannot be expected to police each individual to determine if a sufficient amount of shampoo was used for their hair type. In fact, asking the corrections officer to be that involved in each of the detainee's showering process has the potential to be more invasive than a spray application that takes seconds and is akin to applying bug spray. Inmates are not given any type of shampoo at House of Corrections, only a small bar of soap. R. Williams Depo. at 57:19-20. Officer Rufus Williams expressed a concern that a liquid detergent, such as shampoo, could be used as a weapon in the event that the inmate throws the liquid into the eyes of the guard, or of another inmate. These are risks that are not found when the guard is in charge of spraying the inmate for lice. R. Williams Depo. at 52:10-12, 57:5-9, see also 57:19-20.

In deposition, Plaintiff's counsel questioned current Acting Commissioner of the Department of Corrections, David Carroll, why other forms of disobedience could be handled with administrative punishments, but a refusal to delouse could not. Commissioner Carroll astutely responded that allowing an inmate to refuse to shower or to eat or to clean a cell does not impact the jail population as a whole as a refusal to wash with delousing shampoo might. Carroll Depo. at 56:15-57:2. The risk is too great to put the possibility of an infestation into the hands of an inmate that may or may not choose to comply with the correctional officers mandates.

The Sixth Circuit, in a bizarre misunderstanding of the importance of sanitation within a jail facility and in fact the entire purpose behind compulsory delousing, of the type deemed a valid penological interest in *Florence*, states: Giving a detainee the opportunity to self-apply the delousing agent permits her to weigh the alternatives and choose the option that enables her to comply with the delousing requirement while protecting her self-dignity. Simply spraying the

detainee with a hose as if she was an object or an animal treats her as if she does not have the capacity to make that choice." *Williams*, 771 F.3d at 955. However, there really isn't a choice here where the jail administrators are protecting against a contaminated prison population. Prisoners always have the right to voice an objection and in the face of that objection the inmate could be placed in solitary confinement to guard against the risk of contamination. However giving the inmate the opportunity to wash with the delousing agent is exactly the type of choice that the City of Cleveland was striving to avoid – the choice should come before the time of application.

One of the differences between the *Florence* fact pattern and the case herein is that *Florence* had supervised showers in which the inmate used delousing shampoo. There has been testimony in this case that the shower area in the intake unit is small with three stalls with complete privacy partitions. Clark Depo at 74:4-75:4. For the Defendant to apply the same method as in *Florence*, the Defendant would be forced to decrease its productivity or hire more officers to view each detainee in the shower stall to assure that the lice shampoo was used and not just dumped down the drain. Other courts have deferred to the discretion of jail administrators and have found that a delousing spray was not so different from a facility using a lice shampoo. The District Court of Middle District of Pennsylvania, a member of the Third Circuit (the Circuit from which the underlying *Florence* decision came out) has ruled that the spray application of a delousing agent is a *de minimis* difference from the shampoo used in the *Florence* case. *Logory v. County of Susquehanna*, 277 F.R.D. 135 (M.D. Pennsylvania 2011). As a result, the *Logory* Court found that the plaintiff could not sustain a class action for a Fourth Amendment violation.

Treatment upon detection of lice creates unnecessary risks to the jail population. By the time an individual with lice is detected there could be the beginnings of an outbreak and the dormitory pod may need to be shut down. Inmates also have the opportunity to report a lice or other vermin infestation at booking, but experience has shown that inmates are not always immediately forthright about their medical needs and will delay treatment until they are housed in a unit. Flowers Depo. at 53:6-54:1.

Plaintiff suggests that only delousing those inmates that show symptoms works well in the jail facility in downtown Cleveland also run by the City of Cleveland, but there are differences between the two facilities that impact what the administrators believe to be the best course for delousing. Joseph Stottner, once a jail manager for the House of Corrections and at a different time for the downtown location, stated in deposition when asked why the two facilities handle delousing differently:

> My personal best understanding is that we're dealing with two different situations, two different operations with differing needs. We're dealing with downtown where you have an individual, case-by-case basis for someone who may be found by the nurse to have an infestation, and that is dealt with the best way they can, versus we have another place that's an institution where they deal with large numbers at one time.
> Mind you, the people who go to the workhouse, they're not coming in all day and night. They're coming in large groups. They go to communal areas almost all the time unless they're in some sort of lockdown. They are constantly in close quarters and it's a completely different sort of operation. That is more of a traditional long-term institution, at the workhouse, while the city jail is more of a short-term lockup. So they're not the same place. Stottner Depo. at 62:25.

Simply because these alternatives may work well for one facility, does not mean that the House of Corrections should be required to blindly adopt those practices. Every method has its

detractions and that administrators have the discretion to determine which method is most appropriate for their facility without violating the constitutional rights of their detainees.

X.     **Penological Intake Delousing Procedures do not Violate the Fourteenth Amendment.**

In order to attempt to circumvent *Florence*, the Plaintiffs amended their complaint to assert a claim under the Fourteenth Amendment for an alleged unwanted medical procedure based on delousing. Plaintiffs attempt to mischaracterize the application of a delousing shampoo as a medical treatment. Defendant refutes the notion that the application of a delousing shampoo, or any delousing solution, is a medical treatment. Delousing shampoo is an over-the-counter for in-home use and is administered as a matter of personal hygiene. As such, the application of delousing shampoo on incoming inmates cannot be found to be a form of medical treatment. The agent used in this case, though not a shampoo, has the same active ingredients.

Defendant assumes for the sake of argument that delousing is a medical procedure only for the purposes of this motion. Nonetheless, Plaintiffs' argument that mandatory delousing constitutes a medical procedure in violation of the Fourteenth Amendment fails as a matter of law. *Florence* is controlling authority for Plaintiff's Fourteenth Amendment claim of imposition of an unnecessary medical treatment, and *Florence* allows compulsory delousing. The *Florence* Court emphatically reinforced that a challenge to prison regulation necessitates the application of the *Turner* rational basis test. *Florence*, 132 S.Ct at 1513, 1516, 1523 and generally. Significantly, the *Florence* Court reaffirmed that a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interest."

*Russell v. Richards* – decided before *Florence* – held that a "jail's delousing policy is justified" though it impinges upon an inmates "liberty interest in refusing unwanted medication."

384 F.3d 444, 450 (7th Cir. 2004). The court assumed without deciding that the application of the delousing shampoo could constitute medical treatment since the defendant did not challenge plaintiffs' assertion, however the *Russell* Court found that the medical treatment was reasonably related to legitimate penological interests. *Id.* at 447. In *Russell*, the jail directed prisoners to use a delousing shampoo prior to their entry to the general population of the prison, just as in *Florence*, and *Florence* recognized a "significant interest" in preventing the "danger of introducing lice or contagious infections." *Florence* at 1518.

In *Russell*, the application of the delousing shampoo was not supervised by any jail staff, and so the incoming inmates could have refused to apply the shampoo. The court noted numerous shortcomings in the jail's delousing policy, including that the policy lacked efficacy, and it failed to assure compliance with the shampoo instructions by failing to reapply. While recognizing the deficiencies of the jail's delousing policy, the *Russell* court, nonetheless, found that the delousing procedure passed constitutional muster. In *Russell*, the court concluded that there is a satisfactory connection between the jail's delousing policy and interest put forward to justify it in light of the jail's obligation to the ensured safety and medical well-being of its inmates and personnel. *Russell*, 384 F.3d at 450. The court noted that "…the fit between the jail's legitimate interests and its policy need not be perfect in order to survive scrutiny, it need only be rational." *Russell,* 384 F.3d at 449. Therefore, even if the delousing solution applied on Tynisa Williams was applied incorrectly or in a manner that would not be the most effective to eradicate lice, the application was still a rational response to the jail's legitimate interest in preserving health and well-being within the facility.

Although *Russell* involved the use of delousing shampoo, *Russell* and the present case both use the same brand of pediculicide, Lice-all. *Russell,* 384 F.3d at 446. However; *de*

*minimis* differences in the delousing procedure do not alter the analysis. The Sixth Circuit is clear about where it stands on the issue of an inmate's right to refuse unwanted medical treatment. In *Davis v. Agosto*, the inmate, Davis, claimed that his right to refuse unwanted medical treatment was violated when medical personnel sutured a gash he received in his head while fleeing from his cell and evading prison guards. *Davis v. Agosto*, 89 Fed.Appx. 523 (6th Cir. 2004). In evaluating this claim, the Sixth Circuit relied primarily on the United States Supreme Court's holding in *Washington v. Harper*, 494 U.S. 210 (1990).

*Harper* held that a prison was justified in forcibly medicating a prisoner with antipsychotic drugs. *Id*. 494 U.S. at 236. Without a doubt, forcing a prisoner to take antipsychotic drugs has a far greater effect on an individual's autonomy and is arguably far more invasive than a delousing procedure. *See Russell,* 384 F.3d at 450. "After balancing Washington's interest in maintaining safe prisons against the inmate's liberty interest, the Court determined that the forced medication of a prisoner did not violate the Due Process Clause." *David v. Agosto*, 89 Fed.Appx. at 528 (6th Cir. 2004). In justifying the unwanted suturing, the Sixth Circuit held that "it was well within the authority of the medical officials at the prison to determine that closing the wound was necessary to the health and safety of Davis as well as to those around him." *Id*.

In the case at hand, the City's interest in maintaining safe prisons must be balanced against the inmate's liberty interest of not going through a delousing procedure and potentially being infested with lice. The justification for the procedure has already been confirmed in *Florence* and *Russell*. Like in *David,* the correctional staff at the House of Corrections is well within its authority in determining that mandatory delousing is necessary to the health and safety of the Plaintiffs as well as to those around them. Therefore, with regard to the Plaintiffs'

allegations in their complaint to the purported Fourteenth Amendment claim, in accordance with the rational review test employed by *Florence, Turner* and *Russell*, the policy at issue in the present action should be considered constitutional.

## XI.    Conclusion

The methods used by the Defendant to strip search and delouse its inmates are reasonably related to legitimate penological interests and therefore they do not form the basis of constitutional violations under the Fourth or Fourteenth Amendments.  The Sixth Circuit's opinion in this matter, though informative, was not based on the facts that have been developed in this record.  A thorough reading of Plaintiff Williams' deposition testimony shows that this was just one of several times that she was admitted to the House of Corrections, and while she found the intake procedure embarrassing, it was not so defiling as to constitute a constitutional violation – in fact, she did not even complain about the treatment.  T. Williams Depo at 59:5-60:24.  Furthermore, and especially given the holding in *Florence* and its related cases, the policies of the Cleveland Department of Corrections were not clear constitutional violations for which the Plaintiff and her putative class can recover.  In consideration of the above arguments, Defendant respectfully requests that this Court grant summary judgment in favor of the Defendant.

<div style="margin-left:35%">

Respectfully submitted,
BARBARA A. LANGHENRY, Director of Law (0038838)

By:      /s/Jillian L. Dinehart_____
Jillian L. Dinehart (0086993), Asst. Director of Law
Thomas Kaiser (0014339), Chief Trial Counsel
601 Lakeside Avenue, Room 106 - City Hall
Cleveland, Ohio 44114
E-mail:jdinehart@city.cleveland.oh.us
        tkaiser@city.cleveland.oh.us
Phone: (216) 664-2800   Fax: (216) 664-2663
ATTORNEYS FOR DEFENDANT

</div>

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 9, 2015 the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic system to all parties indicated on the electronic receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

By: <u>/s/Jillian L. Dinehart</u>
Jillian L. Dinehart (0086993)
Assistant Director of Law